[No. G042711. Fourth Dist., Div. Three. June 7, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIE CHANTAL McDONOUGH, Defendant and Appellant.

## COUNSEL

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew R. Fishler and Kevin Bayley for Disability Rights California as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Gary W. Schons, Assistant Attorney General, Eric Swenson and Robin Derman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—Appellant Marie Chantal McDonough was committed to a state hospital in 2000, after having been found not guilty by reason of insanity in a felony prosecution. In 2008, the director of the Metropolitan State Hospital (MSH) filed a semiannual interval report (Pen. Code, § 1026, subd. (f); all statutory references are to the Penal Code unless otherwise stated) recommending appellant be placed in outpatient treatment (§ 1603, subd. (a)(1)). The court conducted a hearing on the issue. All testifying experts concluded appellant should be placed in outpatient treatment. The court found the details of the outpatient program lacking and denied outpatient status.

We reverse because the trial court placed an undue burden on appellant, denying outpatient status not because she would not benefit from outpatient treatment, but rather because the court was not satisfied with the day-to-day details of the proposed outpatient treatment program. The court did not find appellant is currently insane. Instead, the court found the program proposed by the Fresno Conditional Release Program (CONREP) lacking.

A patient has a right to outpatient treatment upon carrying her burden of demonstrating she is no longer mentally ill or no longer dangerous. That right may not be negated by the government's failure to provide the court with the specific details of what will happen every day once the patient is released to

the outpatient treatment program. We will remand the matter to the superior court for further proceedings. If the court finds appellant is either no longer mentally ill *or* not dangerous, but again finds the proposed outpatient treatment program lacking in some regard, it may, "in the exercise of its continuing jurisdiction over appellant," enter orders to cure the deficiencies. (*People v. Cross* (2005) 127 Cal.App.4th 63, 74 [25 Cal.Rptr.3d 186].)

## I

## FACTS

*The Underlying Offenses and Procedural Setting*

In 1999, an information alleged appellant assaulted her father, Ernest, with a firearm (§ 245, subd. (a)(2)), committed two acts of elder abuse (§ 368, subd. (a)), one count naming her father as the victim and the other naming her mother as the victim, on December 29, 1998. The information also alleged appellant personally used a firearm in the commission of each of the offenses. (§ 12022.5, subd. (a).) As a result of delusions, appellant purchased a shotgun and went to her parents' residence to protect her mother from her father. During the incident at her parents' home, she chased her father, threatened to assault him, and discharged the weapon, hitting the ceiling. No one was harmed.

Criminal proceedings were suspended at one point because appellant was not competent to stand trial. (§ 1368.) Once competency was restored, she entered a plea of not guilty by reason of insanity to each charge. After considering the reports of the two doctors who evaluated her, the court found appellant not guilty by reason of insanity and set her maximum term of commitment at 16 years. The court ordered appellant committed to Patton State Hospital on May 10, 2000. She was transferred to MSH on December 5, 2000.

In August 2002, appellant filed an application for release and outpatient treatment pursuant to section 1026.2. She withdrew the petition a month later. Appellant filed another section 1026.2 application for outpatient treatment in January 2004. That application was also withdrawn. In November 2004, appellant filed a petition for restoration of sanity pursuant to section 1026.2, subdivision (e). That petition was subsequently withdrawn as well. Appellant filed a petition for restoration of sanity and unconditional release in September 2005. The court appointed Drs. Kaushal Sharma, a psychiatrist, and Veronica Thomas, a psychologist, to examine appellant. Up to this point in time, every semiannual report filed by Patton State Hospital and MSH recommended appellant's retention at the hospital because she continued to

be mentally ill and a danger to the health and safety of others, even if furnished supervision and treatment in the community.

The court held a hearing on appellant's petition in October 2006. During the hearing, appellant withdrew the petition for restoration of sanity. The court found appellant had not carried her burden and denied the request for outpatient treatment.

In April 2008, MSH's semiannual interval report recommended placing appellant in outpatient treatment. The report stated the consensus of the wellness and recovery treatment team was that appellant was ready for outpatient treatment, appellant had been accepted for community outpatient treatment, and she no longer posed a danger while under supervision in community.

*The Hearing on the Recommendation for Outpatient Treatment: Expert Testimony*

The court held a hearing on the recommendation in September 2009. (§ 1604, subd. (c).) As the Attorney General acknowledges, appellant presented the testimony of a number of mental health professionals, all of whom agreed she could safely be released to an outpatient program. The prosecution did not present any expert testimony.

Dr. Stephanie Walker has been a staff psychologist at MSH since December 2007 and has treated appellant since that time. Walker is familiar with appellant's psychiatric history. Appellant started experiencing symptoms, primarily delusions, in her early 20's and has been hospitalized nine to 11 times. Her initial diagnosis of mental illness occurred around 1986. There have been several diagnoses, including delusional disorder (persecutory type), schizophrenia, and bipolar disorder. Walker said appellant never received stable outpatient treatment and was never stabilized on psychiatric medication until her current hospitalization. Appellant is currently prescribed Abilify, an antipsychotic, and Zoloft, an antidepressant.

Walker reviewed appellant's wellness and recovery plan. Appellant is in a maintenance stage. This involves creating a relapse prevention plan. The plan requires appellant to have insight into her diagnosis and to learn coping skills. Insight requires knowledge of her symptoms and the triggers that impact those symptoms. According to Walker, appellant knows both. She knows her biggest coping skill is taking her medication. She has been taking Abilify since 2005, and would exhibit delusional symptoms if she stopped taking the drug.

Walker said appellant's specific relapse prevention plan is "very extensive" and involves knowing what resources she can go to if symptoms appear.

Appellant is "very familiar" with the Fresno CONREP facility and whom to contact there. She also knows of groups she can attend there, the hospital, and that she can consult her psychiatrist.

Walker said appellant is friendly with staff, patients, and has been danger free for the past 18 months. Appellant has been symptom free since Walker has worked with her. Walker concluded appellant is not a danger to herself or others and has benefitted to the maximum extent possible from the groups at the hospital, has "exceptional insight," and can safely be treated in the community. Appellant is ready to transfer to Fresno CONREP outpatient treatment and the transition would benefit her. In fact, Walker stated it would be detrimental to keep appellant in the hospital, receiving the same treatment she has already received with nothing more to learn there.

Walker said appellant does not attend group therapy classes that repeat what she has already learned. For example, the medication and wellness class is a 12-week course and the curriculum *never* changes. The doctor compared it to taking the same Algebra I class over and over again. Appellant does, however, consistently attend groups with a curriculum that changes from time to time.

Dr. Thomas Grayden evaluated appellant at the request of her attorney. Grayden has previously qualified as an expert in forensic psychiatry in Orange County Superior Court. After having reviewed appellant's record, interviewing appellant, and speaking with a number of staff, his primary diagnosis is that appellant has an unspecified bipolar disorder, characterized by a history of depressive episodes and at least one manic or hypomanic episode historically. The unspecified subtype allows a "description to have other co-morbid type of diagnoses in conjunction with it such as a delusional disorder." Grayden said his review of the records indicates appellant has not had any psychotic symptoms for three years. He further testified she does not pose a threat to herself or others and lacks risk factors that would otherwise be cause for concern. He concluded she does not require a locked state hospital setting and outpatient treatment away from her family is appropriate. He recommended placement in a less restrictive setting such as Fresno CONREP, and added that from a safety standpoint, it would give appellant distance from her father and provide a means of lessening her enmeshment with her mother, allowing appellant to get on with her own life.

The prosecutor asked Walker and Grayden about an April 8, 2008 entry in appellant's file. That entry noted appellant was lying on the floor during a writing activity and was instructed to get off the floor. According to the note, appellant became hostile, loud, and verbally abusive, telling the staff member who made the entry, "you are lying and making this up . . . ." The incident did not change either doctor's opinion.

Dr. Inessa Essaian, a psychiatrist at MSH, has treated appellant since August 2007. Appellant's current diagnosis is delusional disorder, persecutory type. She has also been diagnosed in the past with schizophrenia and bipolar disorder. The doctor stated all three diagnoses "overlap at some point," but believes appellant's main problem is the persecutory delusions. Bipolar disorder and delusional disorder overlap as well when one has a special manic episode with delusional beliefs. However, bipolar disorder requires a history of at least one manic episode and there are no such documented episodes in appellant's history.

A hospital report dated July 9, 2009, indicates appellant has met all objectives and discharge criteria of the hospital. Essaian agrees with the report's recommendation for CONREP placement. In the two years she has worked with appellant, Essaian has not observed any behavior that would lead her to conclude appellant would be a danger to anyone. She added that appellant has been asymptomatic for two years, has good coping skills, and has developed good insight into her mental illness.

The facts surrounding the crime that resulted in appellant's commitment offense and a prior incident, where appellant purportedly poured gasoline on her father and tried to light a match, would not change the doctor's opinion. Those incidents occurred because appellant was having intense delusions and had been drinking and using drugs around that time. Essaian said appellant is "very stable right now" and it is important to transition her to outpatient treatment at this time. Appellant has met all the goals in the hospital, developed good insight into her illness, and has a viable relapse prevention plan. The different diagnoses do not affect Essaian's opinion. The treatments for bipolar disorder and delusional disorder are the same and appellant has a good history of medication compliance.

Mark Duarte is a licensed clinical social worker and the director of Central California's CONREP since 1987. He has testified as an expert on the subject of whether an individual can be treated safely while under the care of CONREP and whether the person poses a danger to self or others. He knows appellant. He said appellant started experiencing depressive episodes in college and experimented with drugs that would exacerbate a mental illness and create a thought disorder. She was in "full-blown psychosis for a lot of that time." She was committed temporarily pursuant to Welfare and Institutions Code section 5150, medicated, stabilized, and released. Once released, she stopped taking her medication, did not keep her appointments with mental health professionals, and relapsed. Duarte said appellant had been committed 12 times.

Appellant's hospital records contain a report by Dr. Burchuk stating appellant stated the television, radios, and birds were sending messages to

her. Duarte said those are common psychotic symptoms. Appellant also thought red cars meant her mother was going to be killed by the devil.

Duarte submitted a report to the court in May 2008, after meeting with clinical staff and reviewing appellant's medical and clinical records at MSH. He also met appellant's parents. His report recommended outpatient treatment and supervision in CONREP.

Fresno CONREP has a one-to-10 staff-to-client ratio and presently has 74 clients, each with a mental disease or defect that cannot be cured. CONREP's purpose is to provide enhanced protection to the community through a standardized system of treatment and supervision. Individual therapy and group therapy are provided and CONREP performs home visits, toxicology screening, collateral contacts, and annual assessments. During the first year, home visits might occur every other week, but daily visits are made as needed.

When one is admitted to CONREP, CONREP usually picks the patient up at the hospital. CONREP provides five levels of treatment: intensive, intermediate, supportive, transitional, and aftercare. For those in need of "decompression from the hospital," CONREP has a 90-day transitional residential program. CONREP also furnishes shared living apartments or houses. Duarte does not feel appellant needs a 90-day transitional setting. Rather, he intends to place her in an intensive setting in an unsecured two-bedroom apartment with other peers in CONREP. No mental health professionals live in the apartment, but the apartment is within walking distance of the program. The residential setting is supervised by staff.

Duarte described the setting as follows: "There are two female clients in the conditional release program that each have primary clinicians, that each have access to clinical staff 24 hours a day, seven days a week via telephone after hours or emergency home visits that we do after hours. She'll check in daily with us. We will make home visits. We will see her daily for at least the first 90 days that she is out in the program and we will get her a bus pass and we will get her clothes and we will get her medical attention and we will get her registered for school if that is what she wanted to do. We will find out by talking with [appellant] everyday what she is capable of doing, what she is motivated to do, and what is the best activity schedule for her . . . ."

The clients who do not go to school or have a job check in with CONREP by 9:30 a.m. each day. If the person is late or nonresponsive, a home visit is immediately made. CONREP has the key to every client's residence. The clients are subject to search and seizure and Duarte stated CONREP is "very intrusive." CONREP corroborates everything the clients do, including what

groceries they have, what their activities are, and whom they associate with. CONREP is involved in "a very intense and direct way" with each client and seeks to be aware of all the client's major life decisions. Clients are not permitted to travel out of the county without written permission.

By the time a patient is placed with CONREP, CONREP will have made an assessment of the community resources and benefits the person will need, and CONREP will walk the person "through every day until they can navigate pretty much on their own." Upon release to the program, appellant would be assigned a primary clinician who would arrange for individual sessions, daily at first, and perform certain case management functions such as helping to establish eligibility for Social Security benefits. Arrangements for food, clothing, and shelter would be made, and necessary medical attention is provided. Duarte stated that "as long as the person follows their regimen[,] they do very well."

If it appears a client has not been taking prescribed medications, the client is immediately remanded into custody to await transfer to the state hospital. If the client is not from Fresno County, a section 1610 hold is placed on the client and the committing court is notified. The section 1610 hold may be for up to 180 days if medication reevaluation is needed and a return to the community is anticipated. In the past when a client has absconded from CONREP, CONREP went to court, obtained a bench warrant for the client's arrest, and filed a section 1610 petition for remanding the client into custody. CONREP has a zero tolerance policy for unlawful drug use and would petition the court to revoke outpatient status if a client uses unlawful drugs. If granted outpatient treatment with CONREP, appellant would not be permitted to stop treatment.

Whether diagnosed as bipolar or with delusional disorder makes no difference in appellant's treatment plan because she must comply with her medication regimen, which at present includes Abilify and Zoloft. Appellant is currently "quite stable" on those medications. Fresno CONREP would assure medication compliance by observing appellant take medications. Duarte will also watch a client take his or her medication if there are concerns about medication compliance. Appellant would have routine lab work performed and see CONREP's psychiatrist once a month. Her behavior would be noted daily.

Appellant signed the terms and conditions of outpatient treatment. The terms and conditions "are guidelines that are required by [Duarte's] conditional release program and have been standardized with the Department of Mental Health throughout the state of family conditional release programs." Fresno CONREP's plan for appellant's treatment was filed in the court in May 2008. Appellant's treatment goal is to "do good and avoid evil."

Duarte said appellant will not pose a danger to the health and safety of others if she is released in a court-ordered outpatient treatment program. He has not spoken with appellant's siblings, but said he would if appellant is released to CONREP. He did interview appellant's parents. They are eager to have appellant released.

CONREP requires a client's list of collateral contacts before being placed in the community. One of the purposes of the contact list is to check and corroborate a client's activities and statements. It aids in making CONREP aware of whether the client is associating with people who might encourage her to consume alcohol or illegal drugs. In other words, the contact list is a means of determining whether the client's stability may be affected by the associations. The only contacts appellant disclosed were her parents. Appellant knows she is to have no contact whatsoever with her sister Michele and her brother Dennis. Duarte said appellant's brother and sister are free to contact him about any concerns or questions.

Duarte knew "there have been several instances of infractions on the units" after his initial report, but was not aware appellant's grounds privileges had been "pulled." He said that if the grounds privileges were pulled because she did not comply with unit routine, that would not affect his opinion. He looks for six months of infraction-free conduct, but what is important is whether the infraction was serious or minor.

HCR-20[1] is a standardized test sometimes used to assess the risk of individuals to be released into the community. The test has not been given to appellant and would be administered once she is transferred to CONREP.

The parties stipulated Dr. Jody Ward is qualified to testify as an expert in the field of forensic psychology. Ward was appointed by the court to evaluate appellant at the request of the district attorney, and to give an opinion as to appellant's readiness for outpatient treatment. Ward has performed at least 100 evaluations to determine whether a patient in a secure hospital should be transitioned into the community. Most of her appointments have come at the request of the district attorney. The vast majority of the time (75 to 80 percent), Ward concludes the patient is not ready to leave the secure hospital setting. She described herself as very conservative in this regard, having worked at Napa State Hospital and MSH.

The doctor met with appellant in April 2009. Appellant told Ward that she had been "a party animal" in college. She said she used marijuana, alcohol, and tried cocaine and mushrooms. Appellant also told the doctor she felt the

---

[1] Historical-clinical-risk-management-20 test.

drugs "tipped off" her mental illness. She then started having vivid dreams, became more delusional over time, and began to believe her father was hurting her mother. She got a gun and tried to shoot him.

Ward also considered writings attributed to appellant predating the commitment offense by a year or more. Those had to do with appellant wanting to kill a college professor she believed was a rapist. Ward said the writings were clearly written by someone who was not of a sound mind.

Ward made a June 2009 followup report at the request of the prosecutor, who asked Ward to review transcripts of the deputy's interviews of appellant's brother and sister. Ward considered the transcripts.

The doctor concluded appellant "is ready for CONREP." The doctor said appellant made the effort to change her release from Orange County to Fresno as a concession to her family, which the doctor thought was noteworthy and a "very positive thing," because appellant did not have to do that.

In reaching her conclusion, Ward considered the committing offense, appellant's mental illness at the time of the offense, the hospital records indicating appellant "has not shown any persecutory delusions for the last three years," and her interview with appellant. The interview was important to determine appellant's insight into her mental illness and her plan for treating the illness once she was released from the hospital. Ward said appellant has insight into the mental illness, knows the delusions are false, and knows how the delusions developed through vivid dreams and her prior thinking that the dreams were special and significant. Appellant knows dreams are triggers and that she has to pay close attention to that fact. Appellant also acknowledged that she was not going to spend too much time alone, because she felt that was a trigger as well.

Ward and appellant discussed stressors appellant is likely to encounter in a conditional release program. Appellant said she would let those around her know that she has been mentally ill before so that they can call CONREP or intervene if the need arises. Ward concluded appellant would pose no danger to herself or others. The fact that Fresno CONREP does not plan to have appellant spend the first 90 days in a secure location does not change Ward's opinion. Neither does the fact that appellant has expressed a plan to get married.

Ward said that while she is not a medical doctor, she does not believe medications affect delusional disorders. In her opinion, the therapeutic environment in the hospital heals the patients with delusional disorders. Having said that, she is of the opinion that the antipsychotic and antidepressant

medications appellant takes are important to her treatment. Ward's opinion about the role of medications is different if a patient has a bipolar disorder as opposed to a delusional disorder. The chemical imbalance present in patients with a bipolar disorder needs to be controlled by medication. Ward was unaware that a doctor opined appellant suffers from a bipolar disorder and not a delusional disorder, but she disagrees that appellant has a bipolar disorder.

*Prosecution Evidence*

The prosecution presented one witness, Dr. Stacey Berardino, a forensic psychologist. Berardino did not testify as an expert. Rather, she testified only to statements appellant made to her when she evaluated appellant in 2005 and 2006. The court overruled appellant's objections to Berardino's testimony.

Berardino spoke with appellant about posttraumatic stress disorder on November 6, 2006. During that conversation, appellant said she had been French-kissed by her father when she was 11 years old. Appellant said she had negative thoughts about the incident and that she worried about it. She said she thinks about the incident every two to three weeks when her parents visit and her father kisses her. Berardino asked how the family dynamics played into the underlying commitment offense and appellant responded, "I haven't worked on this," but that anger at her father may have been involved in the commitment offense. Appellant also made statements about having nightmares.

Berardino asked appellant about medication and appellant stated the medication helps her think more clearly and that she liked the medication, but that she went off the medication for two years when she suffered a side effect from the medication. Appellant said being off the medication did not adversely affect her. When Berardino interviewed appellant in 2005, appellant said the medication does not do anything and that there is nothing for the medication to do. She said talking is everything and medication does not change who you are. She added that she would have hurt her father even if she had been on medication and that talk therapy is the key for her. Berardino asked her why she needed medications and appellant answered that everybody in the hospital has to take medications and she needs to take medicine to get on CONREP. She further stated she takes the medication because her doctor thinks she should, and added that she had not suffered any delusions since she has been in the hospital.

Berardino admitted on cross-examination that a patient's understanding of the need to take medication can change over time. She was not able to state how quickly such a view may occur.

In 1997, appellant's sister, Michele, found documents written by appellant inside appellant's car. She asked appellant about the documents during a

telephone conversation a day or two before the commitment offense. Appellant said the documents were her private journal and nobody else's business. The writings were admitted into evidence and contained appellant's plans to kill Michele and her children, other family members, and appellant's former math professor.

Michele said she is skeptical appellant will comply with her medication regimen, based upon what she perceives as appellant's "long-standing pattern" of agreeing to take medications and not following through. She was also skeptical because she had a telephone conversation with appellant 10 years earlier, before the commitment offense, and appellant said similar things about doing better. During that conversation, appellant attempted to set up a face-to-face meeting with their brother and the rest of the family. Appellant "clearly indicated that she would not hurt anybody."

Michele has not had any conversations with appellant since 1999.

*Ruling Denying Outpatient Treatment*

The court denied outpatient status. (§ 1604, subd. (d).) The court's explanation of its ruling is contained in over 20 pages of the reporter's transcript. The court found the community program director failed to submit an appropriate written recommendation as to the most appropriate forensic conditional release program. The court further found the analysis by "some of the experts" was not thorough and, as a result, the credibility of some of the experts was doubtful.

Specifically, the court was concerned about the change in diagnoses of mental illness in Axis I and Axis II. The court stated the initial Axis I diagnosis was schizophrenia, but in 2004, after appellant had been at MSH for nearly four years, the diagnosis became bipolar disorder. Then, at the end of 2004, there is a first-time Axis II diagnosis of personality disorder. The court stated that diagnosis was not addressed, but rather just simply dropped. In 2005, there was an Axis II narcissistic issue. The court also pointed out that the first time appellant was diagnosed with a persecutory type of delusional disorder was in April 2005, but that diagnosis was changed in 2006 to schizophrenia. The court observed that the January 2008 and July 2009 reports each indicate appellant was in remission for delusion disorder, persecutory type, but no mention was made about any previous diagnosis.

The court did not accept the defense argument that the difference in diagnoses does not matter as the treatment would be the same regardless. The court stated its belief that "each [disorder] requires different medications." On the issue of the differing diagnoses, the court stated it understood the

flexibility of experts giving differing opinions and diagnoses, but that there were "too many things" left unanswered to release appellant to outpatient status "at this time."

In connection with appellant's relapse prevention plan, the court found it important that appellant failed to list all the medications she has been prescribed over the course of the years, leaving half of the drugs off of her medical history including Zoloft, a medication she takes daily. The court expressed concern that though there were indications appellant had a depressive disorder, there was nothing on CONREP's plan concerning Zoloft. The court found the plan to develop a "therapeutic rapport" too general.

The court also found missing from the evidence any supplemental report concerning the May 2006 meeting between appellant and her brother, when appellant made comments about Michele and red cars. The court was "very concern[ed]" about the comments, and the fact they were not addressed by the experts, especially given appellant's past reports of red cars and the color red referring to the devil. Also not addressed was the fact that in 2008 appellant's ground privileges were revoked because of a "behavior incident" in April of that year. The court stated it did not "see [a] thorough type of analysis and review to rely on . . . ."

The court found Sharma's 2006 report flawed. That report stated appellant was ready for outpatient treatment at that time because she had not had any delusions in the previous three years. The court stated Sharma's report failed to consider a "psych note" prepared two weeks before his report which stated, " 'the patient visualizes fear of her father, delusional thought father will kill the mother, movement of the vehicles has special meaning.' "

Also of concern to the court was the March 2006 report of Thomas stating that appellant " 'continues to exhibit limited insight into her illness, triggers, stressors, and warning signs for relapse and past drug behavior.' " Connected with the issue of a lack of insight in 2006 was a February 2009 interdisciplinary note stating that appellant had not been going to certain CONREP groups because she had attended the meetings for years, and had only a 50 percent participation rate in group therapy classes. A September 2009 report states appellant attends about 50 percent of the groups because she said she "[doesn't] get anything out of these groups. I don't go to them anymore." There was also a notation that appellant did not want to answer any questions because she was going to be discharged soon and the questions did not apply to her. This court said this indicated appellant was only providing the information she thought would assist her in attaining her release.

The court stated it had no information on appellant's relapse prevention plan and did not know how CONREP could indicate it identified an appropriate plan for supervision and treatment when it did not have a thorough list of appellant's contacts. As part of appellant's support system, she listed "female friends," but the court did not know who the friends were and whether they would be available to appellant in Fresno, where she would live while in outpatient status. Noticeably missing from a list of contacts is the identity of appellant's fiancé, who appellant stated she met while he was committed at MSH.

The court found disconcerting the relapse prevention plan report was blank on the topics of dangerousness and impulsivity, and contained the notation "individual doesn't want to answer or discuss this page." Appellant did not mention alcohol or drugs under the question asking if she had a problem with substance abuse. The court found appellant's denial of any drug or alcohol problem inconsistent with previous reports and with appellant's statement that the taking of an illegal substance was the cause of appellant committing the offense that resulted in her commitment. The court found appellant had not been honest and forthcoming about her mental illness and past incidents and contacts with family members. "So I have concerns regarding whether the experts were thorough in their analysis of [appellant], especially with the changes in her diagnoses over the course of the years, the fact that there have been other Axis II [diagnoses] mentioned and disappearing and dropped without [any] explanation. To me it was the credibility was damaged because it was incomplete in my eyes. Of course I am mindful this is a standard of preponderance of evidence, but one of the requirements is to submit and prove and identify an appropriate treatment plan for supervision and treatment in the community and all these factors to me add up in formulating this plan."

The court found insufficient Duarte's explanation that once appellant is in the placement program the details can be ironed out. Duarte apparently did not know anything about the person appellant stated an interest in marrying, including the effect of the fact that appellant's fiancé was a former patient at MSH. The court stated it needed the information before the decision is made to grant outpatient status, not after. The court said another example of the lack of a concrete plan in place prior to release was the fact that CONREP had not determined whether appellant would go through a 90-day transitional facility. The court was "unimpressed" with how the idea of placement in Fresno came about. The court said its "bottom line" was the defense did not come close to identifying an appropriate program of supervision and treatment.

The court found CONREP's treatment supervision and treatment plan was "a joke." The treatment plan was simply for appellant to "develop therapeutic

rapport and maintain close contact with the staff of the Central California Conditional Release Program, . . . keep scheduled [appointments] with program psychiatrist and communicate psychiatric symptoms to program staff, [and] . . . correspond with her father and mother with supervision." The court stated there was "no meat" to the plan. The court found the treatment goals (participation in socialization counseling and maintaining contact with family members) wanting, given that appellant's brother and sister had not been interviewed. The court wanted a specific plan laid out by CONREP so the court could determine whether it is an appropriate program for treatment and supervision.

## II

## DISCUSSION

The denial of outpatient treatment after an evidentiary hearing is an appealable order. (§ 1237, subd. (b) [party may appeal an order after judgment affecting the substantial rights of the party]; *People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2 [34 Cal.Rptr.2d 810].) Appellant contends the trial court erred (1) in admitting Dr. Berardino's testimony at trial, and (2) in denying appellant outpatient status.

*The Court Did Not Err in Admitting Berardino's Testimony.*

Berardino did not testify as an expert. Her testimony was limited to statements made to her by appellant in 2005 and 2006. Those statements included the fact that appellant had been French-kissed by her father when she was 11 years old, that she thinks about the incident every two or three weeks when her parents visit her, she had not "worked on" her anger at her father, that she had nightmares, and that she did not need medication because talking (not medication) is everything. Appellant argues on appeal that Berardino's testimony was irrelevant because appellant's statements were remote, made before appellant's doctors discovered the correct medication regime for appellant, and not probative of whether appellant should be granted outpatient status at the time of the hearing in superior court.

A judgment will not be set aside due to an error in admitting evidence absent a timely objection in the trial court clearly stating the specific ground of the objection. (*People v. Nelson* (2011) 51 Cal.4th 198, 223 [120 Cal.Rptr.3d 406, 246 P.3d 301]; Evid. Code, § 353, subd. (b).) The failure to make a timely and specific objection on the ground asserted on appeal forfeits the issue on appeal. (*People v. Nelson, supra,* 51 Cal.4th at p. 223.) Appellant's objection below was that her statements were made in 2006, and thus were not relevant to making an assessment of whether she was ready to

transition to outpatient treatment in 2009. Assuming the objection preserved the issue for appeal, we must reject appellant's argument for it goes to the weight to be given the evidence, not its admissibility.

■ In determining whether outpatient status treatment is appropriate, the court considers the crime that resulted in the patient's commitment. (See § 1603, subd. (c) [recommendations of state hospital and community program director for outpatient status must include review and consideration of patient's criminal offense and prior criminal history].) The offense in this case occurred more than six years *before* the alleged "stale" statements were made. In deciding whether a hospitalized patient should be granted outpatient status (and on what conditions), the court must take into consideration the patient's underlying offense and the progress made throughout the hospitalization. The fact that appellant may or may not have suffered delusions three years before the outpatient hearing is no less relevant than the fact that she suffered delusions 10 years before the hearing when, as a result of those delusions, she committed the acts that resulted in her commitment. By all accounts the statements to Berardino were made years before the director of the state hospital and CONREP found appellant was no longer dangerous and had reached the point in her treatment where she should leave the hospital and rejoin society through outpatient treatment. But again, that goes to the weight to be given the evidence, not its admissibility.

As the court observed in *People v. Sword, supra*, 29 Cal.App.4th 614, "Issues which relate to the questions of whether defendant continues to have a mental illness, and whether defendant continues to be dangerous, can only be fully explored if the trial court is presented with defendant's *complete* medical records." (*Id.* at pp. 635–636, italics added.) Statements made by appellant about having suffered delusions are relevant to the issue of danger-ousness, whether those statements are contained in medical records or not. Accordingly, we conclude the trial court did not err in admitting appellant's 2006 statements into evidence.

*The Court Erred in Denying Outpatient Status.*

We review the court's decision denying outpatient status for an abuse of discretion. (*People v. Cross, supra*, 127 Cal.App.4th at p. 73.) In determining whether the trial court abused its discretion, we look to whether the court relied on proper factors and whether those factors are supported by the record. (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1269 [233 Cal.Rptr. 141] [dangerousness is a proper factor].) In other words, we "consider whether the record demonstrates reasons for the trial court's disregard of the opinion of the treating doctors and other specialists who [all] testified that defendant was no longer dangerous." (*People v. Sword, supra*, 29 Cal.App.4th at p. 626.)

■ Appellant was committed to the state hospital because she had been found not guilty by reason of insanity. (§ 1026, subd. (a).) An insanity acquittee committed to a state hospital may be released from the hospital as provided by section 1600 et seq. (*People v. Soiu* (2003) 106 Cal.App.4th 1191, 1194–1195 [131 Cal.Rptr.2d 421]; §§ 1026.1, 1600.) Pursuant to section 1600 et seq. "a defendant may be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the trial court approves the recommendation after hearing. [Citation.]" (*People v. Sword, supra*, 29 Cal.App.4th at p. 620.)

The director of the state hospital recommended outpatient treatment (§ 1603, subd. (a)(1)), as did the community program director (§ 1603, subd. (a)(2)). All the experts concluded appellant is not a danger and would benefit from outpatient treatment. We note, however, the "judge's role is not to rubber-stamp the recommendations of the [state hospital] doctors and the community release program staff experts. Those recommendations are only prerequisites for obtaining a hearing. [Citation.]" (*People v. Sword, supra*, 29 Cal.App.4th at p. 628.) In other words, a trial court is not required "to follow the recommendations of the doctors and other expert witnesses" so long as the court's reasons for rejecting the recommendations are not arbitrary. (*Id.* at p. 629.)[2]

■ A primary concern of a court called upon to decide whether to grant outpatient treatment to an individual committed to a state hospital as the result of a violent act caused by mental illness, is whether outpatient treatment will pose an undue risk to the safety of the community. (See *People v. Henderson, supra*, 187 Cal.App.3d at p. 1269.) For that reason, a court considers "the circumstances and nature of the criminal offense leading to commitment and . . . the person's prior criminal history." (§ 1604, subd. (c).) After all, commitment of an act constituting a criminal offense and the fact that the act was caused by a mental illness permit an inference that at the time of the verdict the defendant was mentally ill and dangerous. (*Foucha v. Louisiana* (1992) 504 U.S. 71, 76 [118 L.Ed.2d 437, 112 S.Ct. 1780].) As it relates to *current* dangerousness, however, the inference may become weaker as substantial time elapses. (See, e.g., *In re Lawrence* (2008) 44 Cal.4th 1181, 1219 [82 Cal.Rptr.3d 169, 190 P.3d 535] ["At some point . . . when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released,

---

[2] We granted Disability Rights California's request to file an amicus curiae brief in support of appellant. Amicus curiae contends that while a court "is not required to merely rubber stamp decisions of the treatment team, it is not free to disregard the professional judgment of the doctors or other MSH staff who see appellant on a day to day basis." We agree, as far as the statement goes. The court is not free to *arbitrarily* reject the professional judgment of those treating appellant. To hold, however, that the court must agree with the doctors when they are unanimous in their conclusion is to require the court to act as a rubberstamp.

would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness."].)

■ In a request for outpatient treatment, the patient's burden is to show by a preponderance of the evidence that she is "*either* no longer mentally ill *or* not dangerous." (*People v. Cross, supra,* 127 Cal.App.4th at pp. 72, 74; see *Foucha v. Louisiana, supra,* 504 U.S. at p. 77 [insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer"].) All the experts testified in favor of placing appellant in outpatient treatment, even the expert appointed at the prosecutor's request. As the experts unanimously agreed appellant is no longer dangerous and would benefit from outpatient treatment, we look to the court's reasons for rejecting this substantial amount of testimony to determine whether the reasons are arbitrary.

In denying outpatient status, the court stated it found Sharma's 2006 report flawed. Sharma's report failed to consider a "psych note" prepared two weeks before his 2006 report. He did not testify below. Neither did Thomas, who concluded in 2006 that appellant lacked insight into her mental illness, triggers, stressors, and warning signs for relapse. The issue below was whether appellant possessed insight in 2009, not whether she had it three years earlier. The fact that in 2006, Sharma missed a psych note and Thomas opined appellant lacked sufficient insight cannot be turned into immutable facts justifying the denial of outpatient status years later.

The state of the evidence at the hearing on the application for outpatient status in 2009 was that appellant *has* the appropriate insight into her mental illness, knows her symptoms and triggers, and understands that her biggest coping skill is taking her medication. Appellant now knows how the delusions developed through vivid dreams and her mistaken belief the dreams were special and significant. She knows the dreams are triggers and that she has to pay close attention to that fact.

■ The court also found fault with appellant for not attending all CONREP group meetings and stated it expected appellant to participate in all the group programs. While it might ordinarily be advisable for a patient to attend all offered classes, there is no requirement that a patient having already learned what a particular course has to offer must continue to attend over and over and over again, year after year, a course that never changes its curriculum. Dr. Walker testified appellant consistently attends groups with curriculums that change from time to time. However, she compared repeating classes in which appellant has already learned what the class has to offer to taking the same Algebra I class over and over again. Even assuming a court

may insist upon a certain level of participation in courses, repeating perpetual, unvarying courses on an already mastered subject serves no legitimate purpose.

The court appeared to accept that appellant was in remission. Beyond the testimony of the expert witnesses, MSH's recommendation states that appellant "has convincingly expressed her commitment to medication adherence and overall treatment plan." It also states in no uncertain terms that appellant "has not shown any behaviors that put her at risk for being a danger to self and danger to others."

██ Although the court stated concerns about various diagnoses over the years, it also stated that its "bottom line" in denying outpatient status was the defense had not "come even close to identifying an appropriate program of supervision and treatment." This comment is an obvious reference to section 1603 which requires the community director to "identif[y] an appropriate program of supervision and treatment" (§ 1603, subd. (a)(2)), and the granting of outpatient status when "the court specifically approves the recommendation and plan for outpatient status . . ." (§ 1603, subd. (a)(3)). However, the state may not continue to confine an individual who is no longer mentally ill or dangerous by its failure to provide the court with an adequate outpatient treatment program. To hold otherwise would place upon the patient an undue burden to prove that which is beyond the patient's ability or control.

In *People v. Henderson, supra,* 187 Cal.App.3d 1263, a case relied upon by the trial court, Henderson had been committed to the state hospital as a mentally disordered sex offender (MDSO) after his conviction for voluntary manslaughter. The victim was his 10-year-old foster child. Henderson's commitment was extended for two years on two separate occasions. (*Id.* at p. 1265.) The petition seeking the second extension alleged Henderson suffered from a mental disease or defect resulting in a predisposition to committing sexual offenses, presenting a substantial danger of bodily harm to others. (*Id.* at p. 1266.)

A month into the second extension, the medical director of the hospital recommended Henderson be placed on outpatient status. The designee of the Los Angeles County director of mental health and the medical director of Madera County's mental health services each evaluated Henderson and concurred. (*People v. Henderson, supra,* 187 Cal.App.3d at p. 1266.) The trial court denied the request for outpatient treatment. In denying outpatient status, the court stated Henderson's commitment as an MDSO had been extended and he " 'is a danger to society.' " (*Id.* at p. 1268.) Having found Henderson to be a danger to society, the court concluded the treatment program submitted to it was not sufficient to adequately protect society from Henderson. (*Ibid.*)

*Henderson* is distinguishable. Unlike the present matter, it did not present an instance where all the experts concluded the patient was no longer a danger and would benefit from outpatient treatment. Although the two recommendations for outpatient treatment necessary to institute section 1603 proceedings were obtained (*People v. Henderson, supra,* 187 Cal.App.3d at pp. 1265–1266) and the prosecution did not present any contrary evidence (*id.* at p. 1268), the court had recently extended Henderson's commitment as an MDSO because he presented " 'a substantial danger of bodily harm to others,' " as alleged in the petition to extend his commitment (*id.* at p. 1266). That petition had been supported by the declaration of the medical director at Atascadero State Hospital, stating that Henderson had a mental disease or defect and as a result presented a substantial danger of bodily harm to others. (*Id.* at p. 1265.)

 Additionally, while the trial court in *Henderson* found the proposed outpatient program lacking, as did the trial court in the present matter, the court in *Henderson* found the program was inadequate to protect society from an individual the court had determined was still dangerous. (*People v. Henderson, supra,* 187 Cal.App.3d at p. 1269.) There was no such determination in this matter. Rather, the court found the treatment program was "a joke."[3] This is an important distinction because once an insanity acquittee demonstrates he or she is no longer mentally ill *or* dangerous, the patient is entitled to release. One who had been found to be not guilty by reason of insanity "may be held as long as he is both mentally ill and dangerous, but no longer." (*Foucha v. Louisiana, supra,* 504 U.S. at p. 77.) In other words, absent a determination the committed person is mentally ill and dangerous, flaws found in the proposed outpatient treatment plan, including the plan's failure to address the appellant's anemia, do not justify denying outpatient status.

 We reverse because the trial court did not find appellant is currently mentally ill *and* dangerous, and denied outpatient status because it did not find the treatment program appropriate. On remand, the court shall consider the evidence already submitted and any other relevant evidence offered by the parties. The court shall then determine whether appellant has established by a preponderance of the evidence that she is no longer insane or no longer dangerous.[4] If the court finds she made either showing, the court shall grant outpatient status to an appropriate program. Should the court find the proposed outpatient treatment program deficient in some regard, it may, "in

---

[3] Duarte testified that the current statewide rate of recidivism for patients placed in outpatient status is 8 percent since 1986. The recidivism rate for those placed in Fresno CONREP over the same time period is 2 or 3 percent.

[4] We hesitate but are compelled to point out that in determining whether to grant outpatient status, the fact that appellant may desire to seek restoration of sanity in the future is irrelevant to the determination the court is called upon to make.

the exercise of its continuing jurisdiction over appellant," enter orders to cure the deficiency. (*People v. Cross, supra*, 127 Cal.App.4th at p. 74.)

## III

## DISPOSITION

The order denying outpatient treatment is reversed. The matter is remanded to the superior court for further proceedings consistent with the principles set forth herein.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.