Filed 2/23/15  P. v. Timmer CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LORENA ESTHER TIMMER,<br><br>    Defendant and Appellant. | G050106<br><br>(Super. Ct. No. 09NF2522)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Thomas A. Glazier, Judge.  Affirmed.

Charles R. Khoury Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Arlene A. Sevidal and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Operating under the schizophrenic belief it was the end of the world, Lorena Esther Timmer stabbed herself and attempted to kill her 15-year-old son with a three-foot sword.  Timmer pled guilty to attempted murder, child abuse, and aggravated assault with a deadly weapon.  The trial court found her not guilty by reason of insanity and committed her to Patton State Hospital (Patton) for an aggregate maximum term of 14 years and four months.  Two years later, Patton's clinical staff filed a report pursuant to Penal Code section 1026, subdivision (f),[1] stating Timmer was no longer a danger to the community or herself, and she would benefit from outpatient treatment under section 1603, subdivision (a).  The court held a hearing to consider whether Timmer should be placed in the Orange County Conditional Release Program (CONREP).  It determined Timmer had not met her burden of proving she would no longer be a danger to the health and safety of others.  On appeal, Timmer argues the court abused its discretion.  We disagree and affirm the order.

I

A.  *The Underlying Offense*

In 1997 Timmer was diagnosed with having schizoaffective disorder, a condition that causes her to experience auditory hallucinations, delusions, and depression.  For nine years she received treatment and medication from a private psychiatrist, Dr. Ghosheh.  He prescribed both anti-depressant and anti-psychotic medication.  Timmer's delusions related to false beliefs about the Central Intelligence Agency (CIA) and Armageddon.  She also had a history of auditory hallucinations, hearing voices in her head that did not actually exist.  While under Ghosheh's care Timmer was hospitalized eight times for psychiatric reasons.

In 2009 Timmer moved to El Salvador and stopped taking her medication for one year.  She lived with her parents and did not work.  Timmer claimed she did not

---

[1]       All further statutory references are to the Penal Code.

2

experience any symptoms of her mental illness while living in El Salvador. However, when she returned to the United States she immediately began hearing voices and became symptomatic.

On August 31, 2009, Timmer was experiencing severe hallucinatory symptoms and "delusional themes." Specifically, Timmer believed the world was ending, everybody was actually dead, she wanted to die in her son's arms, and she needed to bleed. She retrieved a three-foot sword she kept in a box in her closet. After stabbing herself in the thighs and abdomen, causing herself to bleed, she reached out and stabbed her son's chest area. She believed killing her son would save him "from the end [of] time and the end of the world and save him from dying."

Timmer's son sustained a laceration on his chest, requiring five staples to close the wound. Timmer would have likely killed her son if her brother had not intervened.

B. *The Underlying Conviction*

In 2010 the prosecutor filed an information charging Timmer in count 1 with attempted murder (§§ 664, subd. (a); 187, subd. (a)), in count 2 with child abuse under circumstances and conditions likely to produce great bodily harm and death (§ 273a, subd. (a)); and in count 3 with aggravated assault with a deadly weapon and instrument (§ 245, subd. (a)(1)). As to all three counts, the information alleged Timmer personally inflicted great bodily injury pursuant to sections 12022.7, subdivision (a), 1192.7, and 667.5.

In July 2011 Timmer pled guilty to all three counts and admitted enhancements as to counts 1 and 2. After a court trial on the issue of her sanity, the court determined she was not guilty by reason of insanity. It committed Timmer to Patton for an aggregate maximum term of 14 years 4 months with 811 days credit for time served.

*C. Hearing on Timmer's Suitability*

On June 24, 2013, Patton's clinical staff filed a confidential report, concluding Timmer was no longer a danger. The staff unanimously recommended outpatient treatment. This prompted the trial court to order the CONREP team to evaluate Timmer's readiness for outpatient treatment. A few months later, in September 2013, the CONREP team submitted their evaluation. Suffice it to say, this confidential report contained the unanimous opinion of the CONREP team that Timmer was now ready to be safely and effectively treated on an outpatient basis. The evaluation was submitted and signed by the County of Orange Chief Forensic Psychologist, Stacey D. Berardino, as well as the forensic coordinator of the CONREP program, nurse Linda Price. At the beginning of December 2013, Patton's clinical staff submitted to the court its confidential written recommendation that Timmer receive outpatient treatment. The report noted Timmer had been accepted for placement at Orange County's CONREP program.

On March 11, 2014, the trial court held a hearing to determine whether Timmer should be released from Patton and placed in the CONREP program. The three confidential reports were received into evidence. The court took judicial notice of the fact Timmer "was found guilty, but not guilty by reason of insanity" of attempted murder with personal use of a deadly weapon that caused great bodily injury, child abuse and aggravated assault with a deadly weapon. The court then heard from two forensic psychologists, Berardino and Jennifer Bosch.

*i. Berardino's testimony*

As the Chief Forensic Psychologist for Orange County, Berardino's primary duties related to the CONREP program. She was also involved in training, mental health care, and the supervision of unlicensed psychologists.

She explained the CONREP program is designed to supervise and manage people who have been found guilty of criminal offenses related to the mental health laws.

4

Berardino stated the court appointed her to conduct an evaluation after Patton's treatment team determined Timmer was ready to be released into the community under the supervision of the CONREP program. Berardino stated Timmer's treatment under the CONREP program would include medication from a psychiatrist, group therapy, urine drug screens, weekly visits with therapists, and home visits. Timmer would initially receive the most intensive level of supervision.

Berardino stated she reviewed the records and met with Timmer before writing her evaluation for the trial court. She opined Timmer suffers from schizoaffective disorder depressive type. She explained, "[This condition was] basically . . . a mood disorder in conjunction with a psychotic disorder. In her case when she gets severely depressed, she experiences psychotic symptoms."

After describing Timmer's history of delusions and auditory hallucinations, Berardino discussed Timmer's treatment history. She noted Timmer had no behavior issues or violent incidents at Patton. Timmer took her medication and attended group therapy. She had completed a wellness, relapse and action plan, referred to as a WRAP plan. In this plan, Timmer learned the nature of her mental illness and how to determine when she was getting sick. She learned to indentify her mild, moderate, and severe symptoms and how to manage them.

Berardino stated she discussed the criminal incident with Timmer. Berardino noted Timmer and the treatment team believed the reason Timmer did not experience any symptoms in El Salvador was because she was living in a relaxed environment with her parents, without any employment stresses. Timmer told Berardino she now knows that if a person does not understand their mental illness it can be dangerous because "you start believing things that aren't true or real." They discussed Timmer's WRAP plan and the fact Timmer would need to keep taking her medication "in order to not become dangerous and also watch her stress level because her history" of becoming symptomatic when experiencing stressful situations.

5

Berardino stated Timmer's understanding of her mental illness, how to recognize the warning signs in the beginning stages, and her willingness to seek help were skills relevant to making a risk assessment in terms of dangerousness. Berardino explained, "If you can't identify it, you can't prevent it."

Berardino added Timmer had a master's degree in business and had previously been employed as an office manager, an accountant, and in some capacity with real estate. Timmer told Berardino the real estate job was stressful, and she quit the accounting job based on Ghosheh's recommendation the stress was causing her symptoms to return. Timmer planned to eventually earn a Certified Public Accountant degree and she stated she enjoyed working.

Berardino conducted a risk assessment measure test called the HCR-20. She explained it was a way to organize the historical data with the patient's clinical current picture to forecast the "potential future picture" based on various risk factors. She stated that of the 10 possible historical risk factors only two factors were present in Timmer's case. First, Timmer had a major mental illness. Second, the criminal offense was violent. However, the second factor is mitigated by the fact there had been only one incident and it was committed in adulthood. Other factors considered were Timmer's tumultuous marriage and employment problems. "Buffers to her historical risk factors" include that she has no personality disorder, she is not a psychopath, she has no past abuse, and there was no evidence of substance abuse.

As for the current clinical risk factors, Berardino indentified only one. At times Timmer heard "voices of what we call at baseline, which means at her best she may hear a voice now and then. Those voices are positive and basically tell her to love herself at this point. She is able to identify it if it happens." Berardino opined the voices at this time are "very transient" and did not affect Timmer's functioning, emotions or how she related to other people. Berardino explained one "buffer" to the clinical risk factor was Timmer's insight into her mental illness, symptoms, and potential for future

6

dangerousness. Berardino believed there were no risk factors to suggest Timmer would stop being compliant with her medications.

The last category in the HCR-20 test was to evaluate what potential future situations could be dangerous. Berardino stated that for Timmer "it would be exposure to stresses in a non-graduated manner. So stress with work, taking on too much with school, family stress, relationship stress. Those are things that could put her at risk." She explained CONREP would be aware of these situations and must pre-approve activities. The team would have to agree when Timmer was ready for work or school and at what level.

Finally, Berardino discussed Timmer's relationship with her family and their support. Timmer's son and other family members visit her at Patton. One of the CONREP program's conditions would be contact with Timmer's family because the program relies on family to provide information about changes in her behavior.

Berardino opined that based on all the above, she and the CONREP treatment team believed Timmer was suitable for outpatient treatment. This opinion was based on evidence Timmer had insight and understanding about her mental illness and dangerousness. She had proven her ability to work with treatment staff and honestly disclose her symptoms. Berardino stated Timmer could be safely and effectively treated in the community, and she would benefit from this treatment. Berardino stated Timmer would not be a danger to the community. If the team saw evidence of "decompensation" they had several options, including sending her back to Patton or to a community hospital if she was not severely decompensated.

On cross-examination, Berardino acknowledged Timmer's compliance with her medication was a key factor in recommending release. Berardino was aware that Timmer reported not taking her medication when she was first diagnosed because it made her gain weight. She also acknowledged Timmer recently complained about weight gain from medication while she was at Patton.

7

The prosecutor asked Berardino if her opinion regarding medication compliance was based on Timmer's report she voluntarily took medication for the eight or nine years Ghosheh treated Timmer. Berardino agreed with this statement but also admitted she did not review the records from Western Medical Center regarding Timmer's eight psychiatric hospitalizations while under Ghosheh's care. The prosecutor asked Berardino if her opinion about Timmer would change if she knew three of these hospitalizations were because Timmer failed to take her medication. Berardino stated she would need to know what part of her medication regimen had changed and whether it had been reported to Ghosheh. Berardino explained that while working with Ghosheh he may have changed medications or there may have been medications that caused different side effects for Timmer to be less stable. Berardino theorized Timmer might have stopped taking one medication after telling Ghosheh it was causing a side effect, and if he changed medication, Timmer might have gotten more symptoms resulting in hospitalization. Berardino stated this scenario is different from a person who refuses to take medication because they do not believe they are mentally ill.

Berardino was also cross-examined about whether individuals suffering from mental illness will stop taking medication when they feel better or non-symptomatic. Berardino recognized this sometimes occurred but she could not say how often it happened. Berardino acknowledged Timmer stopped her medication in El Salvador because she was feeling better. However, Berardino believed this would not happen again because Timmer now understood that going off her medication was no longer an option. Berardino opined that although Timmer was motivated to leave Patton, she also clearly understood the nature of her illness and the danger of stopping her medication. Berardino added that if Timmer stopped her medication or self-reporting auditory hallucinations, it was likely others at the care facility or her family members would notice the change in her behavior. If Timmer stopped her medication Berardino would expect Timmer would become depressed and start experiencing psychotic

8

symptoms. Berardino stated that without medication Timmer was capable of engaging in violent behavior.

### ii. *Bosch's testimony*

Bosch is a forensic psychologist. She conducts evaluations for juvenile and adults and also works for the county as a psychotherapist, treating patients between the ages of two and 18. Bosch stated she was appointed by the court to evaluate Timmer and make a recommendation about whether she was appropriate for release. She reviewed the records and Berardino's reports. She met with Timmer and agreed with the diagnosis that Timmer suffered from a schizoaffective disorder. Bosch spoke with Timmer about her disorder, the criminal offense, and her treatment at Patton. Timmer told Bosch she understood medication was "imperative" to control her symptoms. They also discussed Timmer's WRAP plan in detail. Bosch opined it was a "solid" plan and it was reasonable to expect Timmer would eventually be able to move home with her family. She stated Timmer was a good candidate for outpatient treatment because "she is aware of the fact she has a mental illness and understands her mental illness . . . [was] a major contributing factor to her controlling offense." Bosch added Timmer "has a very solid WRAP plan and has [been] building coping mechanisms and support in place. [¶] She is realistic in wanting to go to CONREP. She doesn't want to be released into the community right away. She wants the support of a program and to continue to educate herself about her mental illness and is very invested in her programming. [¶] She is very involved in her therapeutic component in treatment planning and is attending all her groups [and] individual therapy and wants to continue with all of those and is very compliant with medications."

When questioned about the fact Timmer still hears transient voices, Bosch stated this was concerning. However, Bosch noted Timmer was aware of the need to communicate symptoms to the treatment staff and look at medication adjustments. She

9

did not consider this concern as a bar to being treated in the community safely. She concluded Timmer did not present a danger.

On cross-examination, Bosch agreed it was very important for Timmer to remain on her medication. She opined Timmer would not be dangerous in the community because she had significant family support and, more importantly, greater insight into her mental illness and the need for medication.

*D. The Court's Ruling*

After considering oral argument, the court noted, "[It was] very commendable to have family and friends [present in court] on behalf of . . . Timmer. . . . That is no small thing in the court's eyes. It's an important factor in this process in evaluating." Citing to section 1604, subdivision (c), the court stated it must consider the nature of the criminal offense. The court stated it was concerned about the violent nature of the crime "and that type of setting." The court elaborated, "It's fortunate it wasn't more serious. . . . It's fortunate that someone interrupted the offense and it didn't go further. The compliance with the meds is a concern and it's problematic." The court next concluded that based on all the evidence presented in the case, Timmer had failed to meet her burden of proving by a preponderance of the evidence that she would not be a danger to the health and safety of others. The court denied her outpatient status "at this point in time" and returned her to Patton.

II

On appeal, Timmer faults the trial court for issuing a "terse" one-paragraph ruling that failed to explain why it rejected the unanimous expert opinions. Timmer asserts the court abused its discretion by apparently focusing solely on the violent nature of the underlying offense and failing to explain why it found fault with the expert opinions and reports. She concludes the court's failure to conclude Timmer was "presently dangerous" warrants reversal of the order. Although a more detailed

10

explanation would have been helpful to this court, we nevertheless conclude the court did not abuse its discretion.

Section 1600 et seq. sets forth the procedures governing outpatient placement and treatment for various types of forensic committees, including persons found incompetent to stand trial (§ 1367 et seq.) and persons found not guilty by reason of insanity (§ 1026). "We review the court's decision denying outpatient status for an abuse of discretion. [Citation.] In determining whether the trial court abused its discretion, we look to whether the court relied on proper factors and whether those factors are supported by the record. [Citation.] In other words, we 'consider whether the record demonstrates reasons for the trial court's disregard of the opinion of the treating doctors and other specialists who [all] testified that defendant was no longer dangerous.' [Citation.]" (*People v. McDonough* (2011) 196 Cal.App.4th 1472, 1489 (*McDonough*).)

The *McDonough* case is instructive. Defendant was committed to the state hospital after she was found not guilty by reason of insanity. (§ 1026, subd. (a).) The court recognized, "An insanity acquittee committed to a state hospital may be released from the hospital as provided by section 1600 et seq. [Citations.] . . . "'[A] defendant may be placed on outpatient status if the director of the state hospital and the community program director so recommend, and the court approves the recommendation after hearing. [Citation.]' [Citation.]" (*McDonough, supra,* 196 Cal.App.4th at p. 1490.)

In *McDonough,* the director of the state hospital recommended outpatient treatment and all the experts concluded defendant was not a danger and would benefit from such treatment. (*McDonough, supra,* 196 Cal.App.4th at p. 1490.) The *McDonough* court cautioned the "'judge's role is not to rubber-stamp the recommendations of the [state hospital] doctors and the community release program staff experts. Those recommendations are only prerequisites for obtaining a hearing. [Citation.]' [Citation.] In other words, a trial court is not required 'to follow the

11

recommendations of doctors and other expert witnesses' so long as the court's reasons for rejecting the recommendations are not arbitrary. [Citation.]" (*Ibid,* fn. omitted.)

The *McDonough* court discussed what considerations by a trial court would be deemed appropriate. "A primary concern of a court called upon to decide whether to grant outpatient treatment to an individual committed to a state hospital as the result of a violent act caused by mental illness, is whether outpatient treatment will pose an undue risk to the safety of the community. [Citation.] For that reason, a court considers 'the circumstances and nature of the criminal offense leading to commitment and . . . the person's prior criminal history.' (§ 1604, subd. (c).) After all, commitment of an act constituting a criminal offense and the fact that the act was caused by a mental illness permit an inference that at the time of the verdict the defendant was mentally ill and dangerous. [Citation.] As it relates to current dangerousness, however, the inference may become weaker as substantial time elapses. (See e.g., *In re Lawrence* (2008) 44 Cal.4th 1181, 1219 ['At some point . . . when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness'].)" (*McDonough, supra,* 196 Cal.App.4th at pp. 1490-1491.)

The *McDonough* court stated it was defendant's burden to show "by a preponderance of the evidence that she is 'either no longer mentally ill or not dangerous.' [Citations.]" (*McDonough, supra,* 196 Cal.App.4th at p. 1491.) However, when all the experts unanimously agree the defendant is no longer dangerous and would benefit from outpatient treatment, "we look to the court's reasons for rejecting this substantial amount of testimony to determine whether the reasons are arbitrary." (*Ibid.*)

In *McDonough,* the appellate court determined the trial court's reasons for denying release were arbitrary and reversed the judgment. It determined the trial court's attempt to discredit one of the experts was based on an insignificant fact and could not

justify the ruling. (*McDonough, supra,* 196 Cal.App.4th at p. 1491.) The court noted there was nothing to refute the evidence defendant had gained "the appropriate insight into her mental illness, knows her symptoms, triggers, and understands that her biggest coping skill is taking her medication." (*Ibid.*) In addition, the appellate court determined it was improper for the trial court to find fault with defendant for not attending all the CONREP group meetings because participation was not a requirement, especially when defendant had already learned what the course had to offer and attendance "serve[d] no legitimate purpose." (*Id.* at p. 1492.)

In *McDonough,* the trial court found significant that defendant "had not 'come even close to identifying an appropriate program of supervision and treatment.'" (*McDonough, supra,* 196 Cal.App.4th at p. 1492.) The appellate court concluded this was not an appropriate consideration. It recognized section 1603 "requires the community director to 'identif[y] an appropriate program of supervision and treatment' (§ 1603, subd. (a)(2)), and the granting of outpatient status when 'the court specifically approves the recommendation and plan for outpatient status.' (§ 1603, subd. (a)(3).)" (*McDonough, supra,* 196 Cal.App.4th at p. 1492.) However, the court determined, "the state may not continue to confine an individual who is no longer mentally ill or dangerous by its failure to provide the court with an adequate outpatient treatment program. To hold otherwise would place upon the patient an undue burden to prove that which is beyond the patient's ability or control." (*Ibid.*) "In other words, absent a determination the committed person is mentally ill and dangerous, flaws found in the proposed outpatient treatment plan . . . do not justify denying outpatient status." (*Id.* at p. 1493.)

In the case before us, like the *McDonough* case, the experts unanimously agreed defendant is not a danger to the community and would benefit from outpatient treatment. Nevertheless, we conclude the trial court's ruling, albeit brief, provided adequate and rational reasons for denying Timmer's release.

The trial court began its ruling by noting the underlying crime was extremely violent, involved great bodily injury to a close family member, and would have resulted in the victim's death if someone had not intervened. Although the offense was Timmer's first brush with the law, her conduct of wielding a three-foot sword with the intent of "saving" her teenage son by killing him is extraordinarily terrifying. The thought of a repeat performance is reasonably a cause for concern. And because a substantial amount of time had not elapsed since the attempted murder, the nature of the crime was a reasonable and appropriate factor to be considered by the trial court. (*McDonough, supra,* 196 Cal.App.4th at pp. 1490-1491 [courts may consider "'the circumstances and nature of the criminal offense leading to commitment'"].)

In addition to the nature of the crime, the court stated, "The compliance with the [medications] is a concern and it's problematic." This statement is supported by evidence in the record and is likely a reference to the prosecutor's closing argument that compliance with medication in a stress-free hospital setting is not the best indicator of future behavior, especially when there was a history of medical noncompliance. The prosecutor argued there was no guarantee Timmer would continue taking her medication after her release from Patton and the experts agreed Timmer would return to a psychotic state if she failed to take her medication, posing a danger to her family and the community.

Although the experts believed Timmer would continue taking her medication, the trial court's role was not to rubber-stamp their recommendations. (*McDonough, supra,* 196 Cal.App.4th at p. 1490.) The two experts explained their opinions were based on Timmer's behavior, records, tests, and statements made while she was residing at Patton. Neither expert appeared to know much about what happened during the eight or nine year period when Timmer was under Ghosheh's care. Berardino admitted she had not reviewed the medical reports from the hospital where Timmer received treatment for several psychotic episodes. She did not appear to know that

14

several of these hospitalizations were triggered by Timmer's purported failure to take medication. Although Berardino was unaware of the circumstances surrounding Timmer's hospitalizations, she theorized and speculated as to the cause of Timmer's medical noncompliance. The record shows Ghosheh was not called to testify and did not submit a declaration. Because neither Berardino nor Bosch were familiar with this lengthy period of Timmer's mental illness or the reasons she was hospitalized, it was reasonable for the trial court to conclude there was inadequate evidence on the issue of medical compliance. Based on the record before us, we cannot hold the trial court abused its discretion in concluding Timmer failed to meet her burden of proof to be released "at this point in time."

On appeal, Timmer asserts the experts testified the HCR-20 test showed "there was no risk of lack of medication compliance." This contention misstates the record. The experts offered no such guarantees. Berardino explained the test showed a lack of risk factors, she did not say there was "no risk." And while both experts did not expect Timmer to stop taking her medication, they explained there were safeguards in the CONREP program to detect noncompliance in case she did stop. This evidence confirms the inference there are no guarantees. Understandably, Timmer is highly motivated to leave Patton, start outpatient treatment, and eventually return to her family home. However, the court need not blindly accept her promises of medication compliance and self reporting symptoms. As mentioned above, the court was not given a complete picture of the circumstances of Timmer's medical noncompliance when she was working and living outside of Patton or not resting in El Salvador. Therefore, we conclude it was entirely reasonably for the court to be concerned about how Timmer would behave once she left the structured and calmer hospital environment. The trial court's concerns about medicine compliance were not an arbitrary reason for the trial court to deny Timmer's release at this time.

15

III

The order is affirmed.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.