Filed 11/30/20  P. v. Jaimes-Mendoza CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JUAN GABRIEL JAIMES-MENDOZA,<br><br>     Defendant and Appellant. | A156715<br><br>(Solano County<br>Super. Ct. No. FCR276110) |

In 2012, defendant Juan Gabriel Jaimes-Mendoza was found not guilty of murder by reason of insanity for killing his wife in 2010 and committed to a state hospital.  In 2018, the director of the state hospital recommended conditional outpatient treatment for defendant as provided under Penal Code section 1600, et seq.,[1] and, pursuant to that statutory scheme, the trial court held an evidentiary hearing to consider the recommendation.  The state hospital doctors who treated defendant and the representative of the county conditional release program who interviewed him and developed an outpatient treatment plan for him testified that defendant had no current symptoms of mental illness and was suitable for outpatient treatment with supervision.  The People questioned the state hospital doctors' diagnosis of

_____

[1] Further undesignated statutory references are to the Penal Code.

1

amphetamine-induced psychotic disorder and presented witnesses who had reached different diagnoses of defendant when they evaluated him in 2011 in connection with the proceedings that resulted in a finding that defendant was not guilty by reason of insanity. But the People's witnesses had not seen defendant since 2011, and the People did not dispute that defendant had been symptom-free and a cooperative patient for the length of his commitment and that he never exhibited any violence or behavioral problems. At the conclusion of the hearing, the trial court denied defendant outpatient status, apparently on the ground that it could not accept the state hospital doctors' current diagnosis in light of the different diagnoses defendant had received in 2011.

This appeal followed. We shall now reverse and remand because, although the trial court may have had nonarbitrary reasons for questioning defendant's current diagnosis, it does not appear that the court considered whether defendant would be dangerous under supervised outpatient treatment, an inquiry it was required to make. (*People* v. *McDonough* (2011) 196 Cal.App.4th 1472, 1493 (*McDonough*); see § 1603, subd. (a).)

## STATUTORY OVERVIEW

We begin with a brief discussion of the statutory framework that governs outpatient treatment of persons found not guilty by reason of insanity.

When a defendant is found not guilty by reason of insanity, the trial court may order the defendant committed to a state hospital or other appropriate facility unless it appears the sanity of the defendant has been fully restored. (§ 1026, subd. (a); *People v. Cross* (2005) 127 Cal.App.4th 63, 72 (*Cross*).) A defendant so committed to a state hospital may be released in one of three ways: "(1) upon restoration of sanity pursuant to the provisions

2

of section 1026.2, (2) upon expiration of the maximum term of commitment under section 1026.5 [citation], or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1.)" (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 (*Sword*).)

Under the third procedure (which was invoked in this case), a defendant "may be placed on outpatient status upon the recommendation of the state hospital director and the community program director with the court's approval after a hearing." (*Cross, supra,* 127 Cal.App.4th at p. 72, citing § 1603 and *Sword, supra,* 29 Cal.App.4th at p. 620.)

In deciding whether to grant outpatient status, the trial court must consider whether the director of the state hospital or other treatment facility "advises . . . that the defendant would no longer be a danger to the health and safety of others, including himself or herself, while under supervision and treatment in the community, and will benefit from that status" and "[w]hether the community program director advises the court that the defendant will benefit from that status, and identifies an appropriate program of supervision and treatment." (§ 1603, subds. (a)(1), (2).) The court also "shall consider the circumstances and nature of the criminal offense leading to commitment" and the defendant's prior criminal history. (§ 1604, subd. (c).)

The defendant has the burden to prove by a preponderance of the evidence that he "is '*either* no longer mentally ill *or* not dangerous.' " (*McDonough, supra,* 196 Cal.App.4th at p. 1491.) Upon carrying that burden, "[a] patient has a right to outpatient treatment." (*Id.* at p. 1475.)

## FACTUAL AND PROCEDURAL BACKGROUND

*Underlying Offense, NGI Verdict, and Commitment*

On May 9, 2010, defendant killed his wife. In February 2012, defendant pleaded no contest to murder (§ 187, subd. (a)) and admitted to discharging a rifle causing death (§ 12022.53, subd. (d)). The issue whether defendant was not guilty by reason of insanity (NGI) was submitted to the trial court on the psychological evaluations of three psychologists, including Drs. Nakagawa and Winkel. Each psychologist's report was prepared in September 2011. Nakagawa concluded defendant met the diagnostic criteria for a psychotic disorder not otherwise specified (NOS) or a delusional disorder NOS. Winkel observed defendant was hallucinating and delusional and concluded he met the diagnostic criteria for paranoid schizophrenia.[2]

The trial court found defendant not guilty by reason of insanity. In March 2012, the trial court committed defendant to Napa State Hospital (NSH) for a maximum term of commitment of 50 years to life.

*Recommendation for Conditional Outpatient Treatment*

On February 20, 2018, the medical director of NSH notified the trial court of the hospital's recommendation that defendant be released for conditional outpatient treatment.

A seven-page report prepared by NSH staff psychiatrist Muhammad Tariq (2018 NSH report) was filed with the notice. Defendant was reported to have been symptom-free from the start of his hospitalization. Defendant's participation in treatment was excellent, and his risk of violence if placed in the community with supervision was assessed as low because he was likely to remain treatment adherent with supervision.

---

[2] A third psychologist, Stephen Pittavino, also prepared a psychological evaluation of defendant.

4

In May 2018, the community program director of the conditional release program (CONREP) for Solano County, Christie Vice, filed an 11-page placement recommendation report (2018 CONREP report) detailing defendant's forensic profile, his social, medical, substance abuse, criminal and psychiatric history, the results of a clinical interview with defendant, and the CONREP treatment program. The report concluded that defendant could safely and effectively be treated in the community.

*Section 1604 Hearing*

In January 2019, the trial court conducted a three-day hearing on NSH's recommendation for conditional outpatient treatment pursuant to section 1604. Defendant called five witnesses.

<u>Dr. Tariq</u>

Tariq, who testified as an expert in psychiatry, was defendant's current treating psychiatrist at NSH and had been treating him for about two years. Tariq met with defendant for monthly visits of 10 to 20 minutes and saw him daily in common areas. About every six months, he would meet with defendant for one to two hours before writing the semiannual court report required under section 1026, subdivision (f) (§ 1026(f)).[3] When Tariq began treating defendant, he would meet him with the help of a Spanish interpreter. But defendant had been taking English classes at the hospital and "now he converses fairly well in English," so Tariq no longer used an interpreter.[4]

---

[3] When a defendant found NGI is committed to a state hospital, section 1026(f) requires the medical director to submit "a report in writing to the court and the community program director of the county of commitment . . ., setting forth the status and progress of the defendant" at six-month intervals.

[4] A Spanish interpreter assisted defendant at the section 1604 hearing.

5

Tariq diagnosed defendant with amphetamine-induced psychotic disorder with onset during intoxication, amphetamine-use disorder, and alcohol-use disorder. Defendant had not taken antipsychotic medications or any medications for these disorders during the time he was under Tariq's care. Tariq testified defendant was cooperative with all people in his unit and in the hospital and generally did "[w]hatever he's supposed to be doing."

Tariq testified defendant was suitable for supervised treatment in the community based on the following: defendant was not showing signs or symptoms of mental illness and was stable in that regard; he had not had any incidents of aggression or other concerning behaviors since he had been hospitalized; he participated in groups and substance-use-disorder-related meetings; he was willing to work with CONREP and do whatever was required of him in the community; and recently, defendant had been in touch with his family, who could provide some emotional support in the community.[5] Others NSH professionals who interacted with defendant included a psychologist, a social worker, a rehabilitation therapist, and nursing staff, and Tariq was not aware of anyone on defendant's treatment team who disagreed with the recommendation that defendant was ready for community supervision.

In cross-examination, the prosecutor asked whether defendant had more insight into his offense than he previously had, and Tariq responded that defendant still did not remember killing his wife but he now

---

[5] Tariq knew that defendant's father, cousin, and at least one of his sons had been visiting defendant.

6

acknowledged that he killed her.[6] Tariq testified defendant might never remember the offense because of dissociation, meaning "he could not make any memory of that event." Tariq testified that the dissociation "was due to his drug use, so it's not like he has a dissociative disorder or anything like that." Tariq believed there would be "a risk again if [defendant] does drugs."

Tariq explained the diagnosis of "amphetamine-induced psychotic disorder with onset during intoxication" did not mean defendant was intoxicated at the time of the killing. "The onset during intoxication mean[s] that maybe less than one month before that event, he was doing meth. And that made him psychotic. That . . . psychosis can go for months and years, but the diagnosis would still be the onset during intoxication." Tariq testified that usually drug- or alcohol-induced psychosis "clears up within days to weeks, months. It's rare that it would go on for many months or years."

Asked about Dr. Winkel's and Dr. Nakagawa's NGI evaluations of defendant from September 2011, Tariq testified the psychologists "[c]ould be" wrong in their diagnoses.[7]

Tariq agreed with the statement in DSM-5 (as stated by the prosecutor) that "it may be difficult to distinguish a substance-abuse-induced psychotic disorder . . . from the independent psychotic disorder." On questioning from the trial court, he agreed that it was common for people with a psychotic disorder, schizophrenia, or delusional disorder to self-medicate with alcohol or illegal drugs. Tariq is not a forensic psychiatrist.

---

[6] In redirect, Tariq testified that defendant did have insight into the disorders that he was diagnosed with in that he acknowledged that he had them.

[7] In redirect, Tariq agreed it was a possibility that when the original forensic evaluations were done, defendant was still experiencing drug-induced psychosis.

Tariq has treated patients with paranoid schizophrenia and is familiar with their symptoms when they are not medicated. Such symptoms could be auditory or visual hallucinations, delusional thinking (which would be having false fixed beliefs or paranoia), and disorganized thoughts. In his two years interacting with defendant, Tariq was not aware of defendant exhibiting any of these symptoms and was not aware of any staff at NSH reporting defendant had any of these symptoms. He testified that a patient diagnosed with psychosis NOS, who is not medicated, could display symptoms of hallucinations, delusional thinking, and disorganized thoughts, but "[t]here's a possibility that they could be very stable without any of those symptoms, even though they make the criteria of the disorder in the past." Tariq was not aware of defendant having any symptoms associated with psychosis NOS in the two years he had been treating defendant.

Tariq had looked at Winkel's evaluation from September 2011 and knew he conducted psychological tests.[8] He was not aware of any psychological testing done at NSH. He agreed in general that someone with a depersonalization disorder is more dangerous than a person who does not have the disorder.

Dr. Pretkel

NSH psychologist Peter Pretkel testified as an expert in clinical psychology. At NSH, his duties include providing violence risk assessments, court reports, treatment planning, and group therapy. Dr. Pretkel became defendant's psychologist in February 2014 when defendant was transferred to unit T12, a dual diagnosis specialized substance treatment unit; he treated

---

[8] Tariq testified he looked at the reports by Drs. Nakagawa and Winkel "mostly for the parts that were interesting or relevant to me. I have not looked at those reports, every page, every line, or every paragraph."

defendant until the fall of 2016 when defendant was transferred to Dr. Steward. Pretkel would see defendant on an almost daily basis because his office was in the unit, and he interacted with defendant at group therapy and for treatment conferences. He also prepared a violence risk assessment of defendant which he completed in January 2017. The violence risk assessment used the HCR20, an instrument that considers historical factors and current dynamic factors. Dynamic factors include "insight, behavioral, cognitive, and affective stability, violent ideation, treatment response, . . . current symptoms," and "ability to handle stress." Defendant's English was good enough that Pretkel was able to review the violence risk assessment with defendant in detail.[9]

Pretkel concluded (as reported in the 2018 NSH report) that defendant's violence risk in the hospital and in the community under CONREP supervision was low and his risk in the community without supervision was moderate/high. For treatment in the community, Pretkel testified defendant generally "just needs substance disorder treatment." At NSH, defendant never evidenced any delusions like those reported by his family members at the time of the offense. Pretkel never saw defendant respond to internal stimuli (which would indicate auditory hallucinations), and there were no reports of disorganized speech or behavior. Also, defendant was not diagnosed with antisocial personality disorder, which was "a positive for his violence risk."

---

[9] Pretkel did note that defendant had worked with a Spanish-speaking therapist since around 2014 or 2015, but he could not confirm that she was still working with defendant. Defendant also attended Spanish-language groups.

Pretkel was asked how he reconciled the 2011 diagnoses (paranoid schizophrenia, psychotic disorder NOS) with his current diagnosis of methamphetamine-induced psychotic disorder. He responded, "[I]t's a matter of time." "[A]t the time of his reports for not guilty by reason of insanity, one investigator said that he was really clear-thinking, although he had some thought-blocking and some residual symptoms, I believe . . . . And the other investigator, I think, did say that he showed signs of schizophrenia.[10] [¶] And that was a matter of time. So if those assessments were done three months after his offense, or even six months—and some cases, you know, up to a year, but that's relatively rare[,] . . . it still may be methamphetamine-induced . . . psychotic disorder. He has to go for a period of a year without use of amphetamines to really finalize the diagnosis of amphetamine-induced psychotic disorder." At the time of the hearing, defendant had been at NSH and in T12 for more than four years, and Pretkel testified, "We'd certainly see psychosis in those years."

Defense counsel noted that Pretkel's violence risk assessment indicated dissociative amnesia and depersonalization disorder were "a risk factor of insight" and asked Pretkel to explain this. Pretkel responded that he started with Dr. Winkel's NGI evaluation, which stated defendant had a tendency for dissociative symptoms. Pretkel looked for additional evidence of these symptoms in the record and asked defendant's therapist about it. Defendant "has reported that he can feel unreal in times of family stress or financial stress." Pretkel testified that the diagnoses of dissociative amnesia and

---

[10] Without going into detail on the evaluators' confidential reports from 2011, which are part of the record in this appeal, we note that Pretkel's recollection of the evaluators' descriptions of defendant's current state at the time of the interviews was generally correct.

depersonalization disorder helped explain why defendant could not remember killing his wife. He testified that dissociative amnesia and depersonalization disorder are often caused by prior experiences of trauma and defendant had significant trauma.[11] Pretkel testified the depersonalization disorder diagnosis means "in trauma or in memory of trauma or under stress, [defendant] can sometimes feel the world as unreal or . . . him lacking in connection." Even with these diagnoses, Pretkel assessed defendant as a low risk for violence under community supervision. He explained the diagnoses were "descriptive for what his experience looked like and what his experience is," but "they're not causal factors."

Pretkel testified people are less prone to violence "if they have stable family relationships and, in addition, if the family participates in some way in their plan for success in the community," and defendant had improved his relations with this family.

Pretkel also testified about two incidents in T12 he found noteworthy. In one incident, defendant was assaulted by another patient and suffered minor injuries, and defendant reacted appropriately. He did not "return any punches" and was cooperative with staff. The other incident was that defendant tested positive for Tramadol. About the second incident, Pretkel testified, "I don't know what to make of this. . . . I can't say he did or didn't use Tramadol. What I can say is that we did have a lot of problems on the unit with anomalous results." He recalled another patient whose test results showed exactly a different patient's medications, so it seemed there had been

---

[11] Pretkel referred to childhood trauma of defendant witnessing someone killed with a machete when he was eight years old and seeing someone killed by a bullet at a rodeo when he was a child. He further testified that there are no medications prescribed for these disorders, which are "more along the lines of post-traumatic stress disorder."

some mix-up of samples. Pretkel testified that was the only time defendant ever tested positive for anything.

Since he completed his violence risk assessment in 2017, Pretkel has not learned of anything that would increase defendant's risk in the community.

In cross-examination, Pretkel agreed one would "kind of get high" from Tramadol. If the positive test for Tramadol were accurate, defendant may have gotten the drug from another patient. That concerned Pretkel "a bit," but he testified, "even if he had relapsed, in a sense, on Tramadol for a brief high, you have to look at the overall picture of his behavior and treatment adherence." This was "one possible relapse over five years," and it did not change Pretkel's risk assessment. He believed CONREP would provide frequent testing, which would manage defendant's risk in the community. Pretkel also testified that in his experience, after patients realize they had psychosis due to methamphetamine, "they're more able to know why they shouldn't use methamphetamine."

Pretkel did not conduct any psychological testing of defendant. He testified that testing is "only an adjunct for diagnosis. [¶] . . . [D]iagnosis can almost always be done by looking at history and a clinical interview and so forth. . . . I've worked for the state hospital system for ten years, and I've seen . . . testing on this and that, and I've done testing on this and that. And . . . the utility of testing is . . . in my estimation, marginal at best."

The prosecutor then asked Pretkel a series of questions about Winkel's NGI evaluation from September 2011. He reminded Pretkel of his testimony that symptoms of methamphetamine-induced psychosis do not last more than a year after last drug use and pointed out that Winkel observed defendant still showing psychotic symptoms a year and a half after killing his wife.

12

Pretkel responded, "I read [Winkel's] report really thoroughly, and so I would have had to have gone through the thinking that I'm pondering right now. But I don't recall my thought process around that, because I don't have access to the report right now."

Nonetheless, Pretkel stood by his own diagnosis: "Dr. Wink[el] may have used the Rorschach and the MMPI, and he may have come up with conclusions that there's an underlying severe psychosis. But he hasn't observed Mr. Mendoza on a unit for over two-and-a-half years. [¶] And the thing about a psychotic disorder is that you see it. You see it in front of you. And, otherwise, a person doesn't have the diagnosis. [¶] So, I would actually push back on Dr. Wink[el] and say that he didn't have the information he needed. He had a one-time assessment in front of the patient. He did some tests that . . . can support a diagnosis, but . . . I've actually seen Mr. Mendoza on the unit and have synthesized . . . all my knowledge about his behaviors, . . . documents about his behaviors, chart notes, police reports,[12] and my own interactions with him. And I stand by my diagnosis."

Pretkel speculated that defendant may have used methamphetamine in jail, which, in turn, could have continued "propelling him into psychosis." Pretkel had no knowledge of defendant using drugs in jail, but he testified there needed to be an explanation for defendant's psychosis at the time of his assessment by Winkel.

---

[12] Pretkel recounted that defendant's family started noticing strange behavior around the time of his mother's death about a year before the killing, that defendant reported he increased his drug use at that time, that defendant's father knew defendant was taking drugs, and that a coworker said defendant used methamphetamine the day of or the day before the killing.

Pretkel disagreed with the statement in Winkel's NGI evaluation that it was common for a first serious schizophrenic break to occur at defendant's age. Pretkel testified that first schizophrenic breaks commonly occur between the ages of 17 and 22, but defendant was about 33 years old when he killed his wife. "That's really uncommon. It's really unusual."

Pretkel agreed with the prosecutor's statement "if someone has been using methamphetamine, and they also have an underlying psychotic disorder, they can blend together a little bit." But, he explained, the hospital "does a good job" of disentangling drug use from underlying psychotic disorders. At NSH, defendant was not taking anti-psychotic medications, he was not using methamphetamine, and he had no symptoms for five years. This, he testified, "really shows that the correct diagnosis is methamphetamine-induced psychosis." Pretkel noted that methamphetamine "does get into the hospital sometimes," but they saw no methamphetamine use by defendant.[13]

In redirect, Pretkel acknowledged that Winkel reported that defendant presented "with rather florid psychosis, both in an interview and in testing," but his own experience with defendant and defendant's history at NSH were completely different. Pretkel reiterated that no NSH staff reported defendant had psychotic symptoms. In morning meetings with clinicians and in monthly psychiatric assessments, "no one mentioned any psychotic symptoms or the need to intervene for psychotic symptoms. I mean, that's our basic job. It's a psychiatric hospital, and most of what we see are patients with schizophrenia and schizoaffective disorder and other psychotic

---

[13] After defendant reached the highest privilege level at T12, he was randomly drug-tested monthly.

14

disorders. And the primary treatment is medication, anti-psychotic medication."

Dr. Steward

NSH psychologist John Steward, who also testified as an expert in clinical psychology, worked in T12 and replaced Pretkel as defendant's supervising psychologist. He interacted with defendant in English. In March 2018, Dr. Steward prepared a violence risk assessment for defendant like the one Dr. Pretkel prepared in January 2017. He diagnosed defendant with methamphetamine-induced psychosis, dissociative amnesia, and depersonalization disorder.

Steward testified defendant's risk for violence was very low in the hospital, low in the community under CONREP, and moderate to high, "tending toward the high range," without supervision. He concluded defendant's risk in the community with supervision was low based on his behavior in the hospital: "Juan doesn't create any problems on the unit. He does everything he's supposed to do. He goes to groups. He's involved. He's motivated. He's responsible. If he needs to talk with me about something, he'll come up and initiate with me. When I've spoken with him, he has been attentive and has sought to understand the topic of discussion. So given the fact that he's done so well in a treatment environment, the assumption is that he'll do well in a treatment environment on the outside, with supervision."

Steward testified that during defendant's time as his patient, he "has had an ongoing and improving relationship with his family" and reconnecting with his family made defendant happier. Steward was not aware of any family members participating in defendant's treatment planning. Steward

testified that no new information had changed his violence risk assessment since he prepared his report in March 2018.

In cross-examination, the prosecutor focused on demonstrating that Steward improperly copied Pretkel's January 2017 violence risk assessment. He asked if Steward "copied a lot of" Pretkel's report when writing his own. Steward answered that he used "[t]he parts that were relevant" and "there's no sense in redoing it." He testified it was still his own independent evaluation "because I am the one who is doing the interviewing and who is then making sure that the report is accurate." The prosecutor asked if he recalled copying Pretkel's report "word-for-word except for the last three bullet points." Steward initially disputed this characterization, but later reviewed the two reports and agreed the only difference between them was the bullet points at the end.

The prosecutor asked why Steward did not use psychological testing when making risk assessments. Steward began his answer by noting it was "very, very difficult to predict violent behavior, future behavior. The best predictor of future behavior is past behavior." He testified that objective psychological tests "are poor predictors of behavior; otherwise, we could give those. That's why there's been . . . a whole area of research, where people have tried to come up with, develop these kinds of tests or assessments, evaluations, to try to increase the validity and reliability of predicting violence. So it's a tough area, an area of psychology, and so that's why they come up with this kind of a—it's—it's the—objective—looking at the facts, plus the evaluator's judgment and opinion." Steward testified that because "the best predictor of future behavior is past behavior," "drug treatment is so important; how they are—that they develop an awareness of their triggers and warning signs; that they are committed to living drug-free lives; that

16

they have insight. I mean, these are the factors that really contribute to one being able to make an educated assessment as to the likelihood or probability of them either tending to be violent or not violent."

<u>Christie Vice</u>

Vice previously held position of community program director of the Solano County CONREP[14] and wrote the 2018 CONREP report for defendant. Vice began interviewing defendant in 2016 and met him at least six times. She explained that when a state hospital notifies Solano County CONREP they have a patient who may be ready for outpatient treatment, CONREP interviews the patient for appropriateness, consults regularly with the patient's treatment team through liaison visits, and evaluates whether the patient is ready for outpatient care. CONREP does not always agree with the state hospital's recommendation.

In May 2018, Vice determined defendant was appropriate for outpatient treatment. She noted that defendant had been asymptomatic for his entire hospital stay, had no behavioral issues, and was "considered a model patient, by most standards."

Vice knew defendant's diagnosis was amphetamine-induced psychosis. She was not aware of his prior diagnoses although she did review Nakagawa's and Winkel's evaluations.

Vice explained that if a patient is not doing well on community supervision, "whether it's noncompliance with the program, a relapse in substance use or an increase in psychiatric symptoms," CONREP can rehospitalize the patient under section 1610.

---

[14] She left the position in December 2018.

17

In cross-examination, Vice testified she was not aware of defendant's diagnoses of amnesia and depersonalization disorder, but she did know that defendant did not have memory of the offense itself. Vice believed defendant "has the appropriate amount of insight, given the consideration." She explained, "If he has a dissociative amnesia disorder, there's going to be things that he doesn't remember. When confronted with physical evidence showing otherwise, he's been very accepting of his culpability in that, and very remorseful."

### Dr. Brown

At the time of the hearing, Dr. Molly Brown was the acting community program director of Solano County CONREP and would be partially responsible for implementing the outpatient treatment plan for defendant. Brown was not familiar with defendant and did not write his treatment plan (Vice did), but she had implemented outpatient treatment for other patients for whom she had not authored the treatment plan in the past. In cross-examination, she agreed that she "would feel much more comfortable making [her] own independent evaluation and [her] own independent treatment plan, before anything was implemented for the defendant."

The People opposed outpatient status and called two psychologists who had evaluated defendant in 2011.

### Dr. Nakagawa

Dr. Janice Nakagawa was appointed by the court to evaluate defendant for his NGI trial in 2011. At that time, she reviewed records provided by defense counsel, summary reports by the investigators in the case, interviews by detectives, jail mental health records, and psychological testing completed in August and September 2011 by Dr. Winkel, who had been privately

18

retained by defense counsel.  She also interviewed defendant once in August 2011 for about two or three hours.

When Nakagawa interviewed defendant, he acknowledged using methamphetamines but indicated he had not used it in the days prior to the offense.  She testified that defendant reported he had increased his methamphetamine use "in the few months before" the offense.  Nakagawa asked him about "whether he was seeing things and had mental health issues even before he increased his methamphetamine use," and defendant said he saw things in the sky and described "an array of symptoms that conveyed delusional, as well as visual, a lot of visual hallucinations."  Defendant told her "he felt some 'strange phenomenons,' . . . even when he was not using drugs."

Nakagawa had never heard a psychological expert say (as Pretkel did) that psychological testing was of marginal value.  She believed "psychological testing can play a very critical, if not prominent, role in assessments.  I'd liken it to the physician, who may order a battery of testing, and it can be for purposes confirming, ruling out or even pointing to other possible symptoms, that were not clearly noted . . . by the clinician . . . ."

In 2011, Nakagawa concluded defendant met the diagnostic criteria for psychotic disorder NOS or delusional disorder NOS.  She testified defendant exhibited symptoms 15 months after the offense: "By the time I saw him in August, he continued to evidence delusional thinking, talked about evil spirits, talked as if it were still true for him at that point."  Nakagawa testified defendant did not want to talk about his mental health issues and her impression was that he did not want to present as having serious mental health symptoms.  She testified he was "not trying to fake them or trying to exaggerate them, which is critical in this kind of assessment in particular."

19

Nakagawa testified it was her experience that psychotic disorder NOS and delusional disorder do not just go away over time but added "anything can happen." She agreed that defendant's diagnoses of dissociative amnesia and depersonalization disordered based on his lack of memory of the offense would be cause for concern. "In a dissociative state, one is not aware of what's happening. If the argument is that this individual was experiencing, if any, dissociative amnesia or dissociative episodes at the time of the instant matter, in which that individual acted out in a very unpredictable violent manner, there certainly is cause for concern that that potentially may happen in the future; but who knows?"

In cross-examination, Nakagawa testified she had not seen defendant since August 2011 and did not review any of his NSH records regarding his treatment. She has treated patients in state prison hospitals and agreed some were misdiagnosed. She observed that in the prison system, once a person receives an initial diagnosis, it may be repeated in a rote fashion.

Asked whether she would expect to see symptoms in an unmedicated psychotic person within two months, Nakagawa responded, "It's not clear, . . . for example, with a delusional disorder—and that's what I said in this case . . . —there are individuals who can present as very rational, can complete day-to-day tasks, can respond to directives, can look 'normal,' in quotes, but may . . . evidence delusions, and unless that's actively discussed or probed or the focus of discussion, that may never come—become known even by the clinician." She testified an unmedicated delusional person could hide it for a year or two years. (She was not asked about longer periods of time.) Presented with the hypothetical of "an unmedicated person, with a psychotic disorder, who does not manifest any dangerous behavior [for] six years," Nakagawa could not say the person was "likely a low risk."

20

Nakagawa testified she had no opinion about defendant's current situation and it would be unethical for her to speculate. She agreed "the literature indicates that drug-induced psychosis can impact people, over a year, up to two years." She agreed that it was possible that when she met defendant, he could have been suffering drug-induced psychosis 15 months after using methamphetamine. She testified that, in that case, "I would have been wrong" "in my opinion."

Dr. Winkel

Dr. Ricardo Winkel, a clinical and forensic psychologist, was hired by the defendant's attorneys (the public defender's office) in 2011 to give "a general impression of the defendant's psychological functioning, particularly at the time of the alleged offense." After reviewing police records on the investigation, he met with defendant twice (in August and September of 2011) to conduct a clinical diagnostic interview and administer psychological tests.[15] Winkel is fluent in Spanish, and he interacted with defendant in Spanish.

Winkel testified that at the time of the clinical interview, defendant "was completely psychotic . . . . He was hallucinating. He was delusional. At times, his thinking was disorganized." He noted that defendant "was not uncomfortable with the fact that he was having delusions." In contrast to patients who are distracted by their hallucinations, "defendant was not distressed. Another way to put it is he was far too gone to realize at the time

_____

[15] Winkel gave the following tests: the Beck's Depression Inventory, 2nd edition; dissociative experience scale; Miller Forensic Assessment of Symptoms; Minnesota Multiphasic Personality Inventory, 2nd edition; Neurobehavioral Cognitive Status Examination; the Personality Assessment Inventory; the Rogers Criminal Responsibility Assessment; Rorschach Inkblot test; and the Trail test.

21

that he was having psychotic symptoms. Winkel's impression was that defendant "exercised very poor judgment based on . . . a severely distorted perception of reality."

Winkel's testing showed "some indications of cognitive dysfunction" and "very clearly indicated the presence of a psychotic condition, possibly and most likely, schizophrenia." Winkel testified the test results were consistent with defendant's reported mental condition and with clinical observation, and he diagnosed defendant with paranoid schizophrenia.

Winkel concluded defendant suffered from a lifelong schizophrenic condition. He testified schizophrenia typically starts in the late teens into the 30s. He stated it was "rather common" for schizophrenic patients to use drugs "partly in an effort to self[-]medicate, to soothe the inner turmoil, to calm down ideas and emotions."

Winkel testified at length about how to differentiate between substance-induced psychosis and schizophrenia: "[T]here are typical markers or signs or symptoms that guide or drive the diagnosis. I relied on them to determine that the defendant was suffering from paranoid schizophrenia, not from any other condition. There are specific markers that would have driven a different diagnosis. There are neurological signs that help differentiate amphetamine-induced psychosis from other conditions, including schizophrenia.

"Those are what they call stereotype, involuntary movement, which is rubbing the fingers or rubbing the face; facial twitches; dyskinesia, or gross movement disorders, usually [a]ffects gait. There is an increase in norepinephrine, and that can be tested. There are neuropsychological or cognitive signs under the heading of non[-]age-related cognitive decline. The reason is that that type of drug is favored, or liked, by certain parts of the

brain. Mostly the frontal striatal lobes, the parts of the frontal lobes and the limbic system that's part of the so-called pleasure circuit, and factual in terms of actual measurable behavior that can be seen as decreases in episodic memory, processing speed and mostly [a]ffecting functioning. This is the ability to do things. [¶] That's very observable, People that are seriously [a]ffected by methamphetamine addiction have more trouble doing the things . . ., more than they would have had if they were not addicted or using large amounts of amphetamines. There was no indication that that was the case.

"They're also purely psychological signs. The presentation initially can be very similar in one condition and the other. Drug induced versus schizophrenia. [¶] In both cases, your likely to see delusions and hallucinations. Persecutory delusions such as was the case with the defendant . . . . You have to have a narrative that someone is after you and intent on causing harm. [¶] In schizophrenia, . . . there's an additional phenomena that those are bizarre delusions, unorganized, and there was plenty of evidence that the defendant had bizarre delusions dating back to his late childhood, early adolescence, and that's not a marker of amphetamine-induced psychosis."

Winkel also testified that a symptom unique to amphetamine-induced psychosis is tactile hallucinations such as a feeling of "insects crawling under your skin," which is often accompanied by "sores all over the body." Defendant did not complain about such sensations, and Winkel did not observe sores on his skin. He concluded that "all the signs pointed uniformly in the direction of paranoid schizophrenia and none in the direction of a drug-induced condition."

Winkel testified that schizophrenia does not go away and cannot be cured; it can only be treated. He testified that, if defendant had paranoid

schizophrenia but he was only treated for drug abuse, then "the underlying psychosis would be left untouched and untreated." He further testified that "the more restrictive the environment, the less likely you are to see observable signs of schizophrenia," suggesting this could explain how NSH staff did not observe symptoms in defendant for years.

Asked whether Steward behaved appropriately in copying Pretkel's report, Winkel suggested that Steward's conduct was of the type that "would compromise [his] license, most likely lead to . . . probation or loss of [his] license, suspension or loss." He also testified it was a violation of the American Psychological Association's code of ethics.

In cross-examination, Winkel acknowledged that he had not seen defendant since the meetings in 2011 and that he had not reviewed his NSH records. He agreed that defendant's psychotic delusions during the 2011 interviews were so pervasive that defendant did not recognize they were psychotic. But Winkel did not agree with the suggestion that defendant's type of severe mental illness would necessarily be difficult to hide from psychological professionals. He noted that there are high functioning people who suffer from chronic schizophrenia who have learned to keep their symptoms private. On the other hand, Winkel did agree that he observed defendant's psychosis and did not see any indication that defendant "was trying to cover up or hide or dissimulate his symptoms." He testified that a person is not dangerous just because he is a paranoid schizophrenic and that the "most dangerous situation is an angry paranoid schizophrenic that has delusions of persecution."

Winkel could not say whether a patient who is unmedicated and asymptomatic is likely to be less dangerous. "That would require a thorough evaluation," and he would not make such a determination without "a

24

thorough psychological evaluation with forensic indicated and validated tests, beyond the smaller tests that are oftentimes used in the state hospital, like the HR-20."

Winkel did not have an opinion about defendant's current level of dangerousness. He testified that, without assessing defendant, it would be unethical to opine on whether defendant was ready for community supervision.

The trial court asked Winkel how old defendant was when he reported his early visions or hallucinations. Winkel recalled that defendant reported he "saw a female figure at the tip of his penis," among other visions, "in his late adolescence." Winkel testified defendant "reported what we, as clinicians, would consider bizarre hallucinations, which are different from what you would get with a drug-induced psychosis. Those are more typical of a schizophrenic process."

In addition to hearing the foregoing testimony, the trial court reviewed defendant's mental health records from NSH and heard counsels' argument. Defense counsel acknowledged the NSH witnesses were "not as impressive as Dr. Winkel in their testimony, in their report preparation," but she urged that the medical records nonetheless showed defendant had no symptoms of mental illness or behavioral problems. The prosecutor suggested Dr. Pretkel's opinion was questionable because he did not believe in psychological testing and argued Steward's violence risk assessment should be disregarded because "[h]e just plagiarized it." He argued Tariq's recommendation was only as reliable as Pretkel's since he was "really relying on Dr. Pretkel's report from 2017."

*Trial Court Ruling*

The trial court denied defendant outpatient status. The court stated its reasoning on the record as follows:

"I'm going to start with some comments before I tell you what my ruling is. And just recite some of the evidence that I heard. So Dr. Pretkel testified in front of me that if you see symptoms of psychosis persist for over a year following cessation of meth use, that's more an indication of an actual psychotic disorder. . . . [¶] Dr. Tariq testified that he briefly reviewed the reports of Dr. Nakagawa and Dr. Winkel and Dr. Pittavino from the 1026 process. . . .

"Really difficult for the Court to place any reliance on what Dr. Steward testified to. I went through his written report, compared it to Dr. Pretkel's report from a year-and-a-half or so earlier. He's got just identical wording. I mean, not even a few words different for some of these paragraphs that start with the phrase: At his interview for this report, referring to Dr. Steward's interview the time he spent with Mr. Jaimes-Mendoza. [¶] He denied under oath that he copied Dr. Pretkel's report. So he testified under oath: I didn't copy his report. I'm sorry, I think that was untrue. That was untrue testimony by Dr. Steward. His whole report is primarily a cut and paste job from Dr. Pretkel's earlier report. [¶] So the People saying he plagiarized Dr. Pretkel's report, I agree with that. But more to my point, I think he was untruthful when he testified in front of me. After being sworn to tell the truth. I frankly was just appalled by all of that.

"Dr. Nakagawa testified that people with delusional disorders can present as normal.

"Dr. Winkel, I think, did the most thorough workup of all of the doctors that testified, past or present, in front of me in this hearing. He did his

testing, malingering testing, other tests.  He spoke Spanish with the defendant.  One of the things he said is he didn't observe any tactile dyskinesia back in 2011 meth-induced or substance use psychosis that's often a sign of that.

"Something—and this isn't fundamental to my decision today, but I went through a June 2017 CONREP liaison report, there's a program that the defendant has to actively participate in.  It's called the ISRU program.  It's designed to help patients understand how their history of alcohol and drug use lead to their crimes or led to their crimes.  There's an oral component, verbal component and a written component, but the workbooks are only in English, so they've waived the requirement that Mr. Jaimes-Mendoza participate in a written form of that.

"Is that a big issue?  Probably not, since he's programming in the oral part of it, but is that good practice when you're assessing risk to the community and even your own hospital that has diagnosed him with the prominent risk related to substance use and not some other independent health condition?  This is . . . in an era where Hispanic individuals . . ., they're the most populace racial or ethnic group in our state right now.  Even our schools have materials in Spanish, written materials in Spanish.  [¶] Now, I'm not saying that all Spanish speaking individuals can't also read and write English, I'm sure the majority of them can, that's not what I'm saying, I just found that disturbing, that as of 2017, for Spanish speaking patients at the hospital, at least in that program, there's no written materials.

"What am I to make of this evidence from—so May of 2010 is the defendant's arrest.  August, September—July, I think Dr. Nakagawa interviewed him.  So July, August, September of 2011, the forensic interviews

27

for the NGI plea, 15, 16 months, 14, 15 months after, arguably, all meth use has ceased, and yet both Dr. Nakagawa and Dr. Winkel testified that they observed the defendant being floridly psychotic in 2011.

"I think all of the testifying doctors, both from Napa and those two doctors said that that's a real stretch to believe that psychotic symptoms in August and September of 2011 would relate to methamphetamine use, if the meth use stopped in 2010, in May of 2010.

"I have no evidence before me that Mr. Jaimes-Mendoza was using methamphetamine or other substances in the jail setting. [¶] So am I to conclude that he just flat out lied to Dr. Winkel, Dr. Nakagawa, and Dr. Pittavino, and that he was such a good liar that he could fake those symptoms to three different doctors, pass the anti-malingering test, complete the Rorschach test in a way that demonstrated psychosis, when in fact he had no psychosis? [¶] And if that's the Court's conclusion, what does that say about the current risk assessment? Because if those reports are only briefly reviewed and that possible explanation for the 2011 observations by the doctor is not accounted for, how can I have any confidence that the Napa folks have accurately, reasonably assessed the defendant's current risk to the community? I really don't think I can.

"And then the flipside of it is, they haven't been treating him for a psychotic disorder. So if they haven't been treating him for a psychotic disorder because they don't believe he has one, but in fact he does have one, as diagnosed by Dr. Nakagawa and Dr. Winkel, and, to some extent, Dr. Pittavino, then, again, the risk hasn't been accurately or adequately assessed.

"So either way, . . . I don't think the current risk assessment is accurate. And frankly, I just don't believe the testimony I heard from the Napa doctors. I found it shocking that if that's your diagnosis,

28

methamphetamine-induced disorder, you're telling the Court the defendant was never legally insane, wasn't legally insane at the time of the crime, that's the l[i]nchpin of your argument for release, and you've only briefly reviewed those diagnostic reports from 2011.  I just . . . can't come to closure with that.

"So I appreciate that he hasn't received psychotropic or antipsychotic medications in the jail, but I just am not satisfied that the burden of proof has been met, the preponderance that it is, not beyond a reasonable doubt. There's just some really disturbing things here that I just can't reconcile without denying the petition.  So that's the Court's ruling."

## DISCUSSION

Defendant contends the trial court abused its discretion in denying him outpatient status because there was no evidence he would be dangerous as a result of a mental disorder if he were conditionally released for supervised treatment.

A.    *Standard of Review*

We review the trial court's denial of outpatient status for abuse of discretion.  (*Cross*, *supra*, 127 Cal.App.4th at p. 73.)  "[I]t is not sufficient to show facts affording an opportunity for a difference of opinion" (*ibid*.), and a trial court has the discretion to "disregard [doctors'] recommendations for nonarbitrary reasons" (*Sword*, *supra*, 29 Cal.App.4th at p. 629).  The court's role "is not to rubber-stamp the recommendations of the [state hospital] doctors and the community release program staff experts," (*id*. at p. 628); rather, the court is "entitled to consider the validity of the opinions presented to it in determining whether defendant met his burden of proving that he [is no longer] dangerous" (*id*. at p. 630).

Still, the abuse of discretion standard is deferential, not empty.  (*People v. Giordano* (2007) 42 Cal.4th 644, 663.)  "A court can abuse its discretion by

29

applying an erroneous legal standard or by making a ruling unsupported by substantial evidence." (*People v. Armstrong* (2019) 6 Cal.5th 735, 756.)

B.    *Analysis*

Here, as defendant observes, the trial court "share[d] its thought process in great detail" in stating its ruling. In short, the court was not persuaded by defendant's witnesses that the appropriate diagnosis was methamphetamine-induced psychosis.

The trial court appears to have found Dr. Winkel, who diagnosed defendant in 2011 with paranoid schizophrenia, to be the most impressive and reliable witness. Indeed, defendant recognizes, "the court clearly found [Winkel] to be the most convincing expert." The trial court noted that Winkel did "the most thorough workup of all the doctors that testified," that he spoke Spanish with defendant, and that he did not observe any tactile dyskinesia in defendant, which would have indicated methamphetamine-induced psychosis. These observations are supported by the record.

And the court offered reasons for questioning the NSH doctors' current diagnosis of methamphetamine-induced psychosis. The court discounted Dr. Steward's testimony because it appeared that he copied Dr. Pretkel's violence risk assessment and then lied about having done so at the hearing. Appellate counsel does not take issue with the court's credibility finding in this regard. The court noted that Dr. Tariq only "briefly reviewed" the 2011 NGI evaluation, indicating the court questioned Tariq's conclusions because the doctor failed to take Winkel's evaluation fully into account in reaching his own diagnosis. As for Dr. Pretkel's testimony, the court correctly noted that Pretkel testified psychotic symptoms from methamphetamine-induced psychosis last no more than a year. This made it difficult for him to explain how Winkel observed psychotic symptoms in defendant in August and

September 2011 when defendant had been in custody since May 2010. Pretkel speculated that defendant used drugs in jail as this was the only explanation he could come up with for the psychotic symptoms lasting so long. But the court correctly noted no evidence was presented that defendant used drugs in jail. Thus, the trial court gave reasons for crediting Winkel's diagnosis from 2011 and for questioning the different current diagnosis of the NSH doctors, and at least some of those reasons find support in the record.[16]

The issue before the trial court, however, was not solely defendant's diagnosis but also whether supervised outpatient treatment would benefit defendant " 'and cause no undue hazard to the community.' " (*Sword*, *supra*, 29 Cal.App.4th at p. 620; see § 1603, subd. (a)(1) [the court shall consider whether the director of the state hospital advises "the defendant would no longer be a danger to the health and safety of others, including himself or

---

[16] Defendant points out that not every statement in the trial court's ruling is supported by the record. The trial court stated, "*all* of the testifying doctors, both from Napa and those two doctors said that that's a real stretch to believe that psychotic symptoms in August and September of 2011 would relate to methamphetamine use, if the meth use stopped in 2010, in May of 2010." (Italics added.) The Attorney General concedes the record only partially supports this finding. In fact, only two NSH doctors testified that drug-induced psychosis rarely or never causes psychotic symptoms that last over a year, and the remaining witnesses did not so testify. Dr. Nakagawa, to the contrary, testified drug-induced psychosis can last "over a year, up to two years." Dr. Winkel was not asked how long drug-induced psychotic symptoms may continue after last drug use. And it does not appear Dr. Steward testified on this question either.

The trial court also stated the 2011 NGI evaluations were "only briefly reviewed" by the NSH doctors. The record supports this observation as to Dr. Tariq, but Dr. Pretkel testified he read Winkel's report "really thoroughly." Defendant argues, "it appears the trial court improperly discredited Dr. Pretkel's testimony by mistakenly conflating his diligent efforts with the less meticulous efforts of Dr. Tariq."

31

herself, while under supervision and treatment in the community, and will benefit from that status"].)

"One who had been found to be not guilty by reason of insanity 'may be held as long as he is *both* mentally ill *and* dangerous, but no longer.'" (*McDonough, supra,* 196 Cal.App.4th at p. 1493, quoting *Foucha v. Louisiana* (1992) 504 U.S. 71, 77, italics added.) In *McDonough,* a trial court denied an appellant outpatient status on the ground she had not identified an appropriate program of supervision and treatment. (*Id.* at p. 1492.) The Court of Appeal found the trial court overstepped its authority explaining, "absent a determination the committed person is mentally ill and dangerous, flaws found in the proposed outpatient treatment plan . . ., do not justify denying outpatient status." (*Id.* at p. 1493.) The *McDonough* court reversed the lower court's denial order "because the trial court did not find appellant is currently mentally ill *and* dangerous . . . ." (*Ibid.*)

Similarly, in the present case, the trial court did not appear to find that defendant would be a danger while under supervision in the community; it stated only that it could not accept NSH doctors' current diagnosis.[17]

---

[17] The Attorney General argues the court "implicitly found that as of January 2019 appellant was still mentally ill *or* dangerous." (Italics added.) Clearly, the trial court could not deny outpatient status based solely on defendant's current mental illness if defendant was not also dangerous. (See *Cross, supra,* 127 Cal.App.4th at p. 74 ["the persistence of [defendant]'s mental illness was not alone sufficient to deny him outpatient status if he was no longer dangerous"].) Assuming the Attorney General meant to say the trial court implicitly found defendant was currently mentally ill *and* dangerous, we are not convinced. Rather, we agree with defendant, who posits, "the absence of even an implied finding in this regard—when the trial court offered such a detailed oral statement of reasons for refusing [to] place appellant on outpatient status—is a telling omission in this case given the lack of any expert opinion from either side's witnesses suggesting appellant

Because the trial court denied outpatient status without making a finding on dangerousness, we reverse.

Here, there was strong evidence defendant would not be dangerous in supervised outpatient treatment. It was not disputed that defendant never had an incident of aggression or concerning behavior since he entered NSH in May 2012. Nor was it disputed that defendant was on no medication yet exhibited no symptoms of mental illness during his commitment. Dr. Tariq testified defendant was cooperative and was "willing to work with CONREP in the community and willing to do whatever they require him to do in the community." Vice testified defendant "met all of the discharge criteria, that both his hospital team has requested and the CONREP has requested. He's been asymptomatic for his entire length of his hospital stay. He's not on medication, although he has agreed to medication if it's clinically indicated. He has had no behavioral issues since his time in the state hospital. He's been considered a model patient, by most standards." Dr. Pretkel testified about a recent incident in which defendant was assaulted by another patient and defendant reacted appropriately and was cooperative with staff.[18] And although Dr. Winkel could not opine on defendant's current level of dangerousness (having not assessed him since 2011), he did testify that a person is not dangerous just because he is a paranoid schizophrenic. Rather,

---

was dangerous. Appellant had the burden of proving that he would not be dangerous in a supervised outpatient setting, yet in denying the conditional release petition the trial court made no mention of dangerousness and did not make a single comment that indicated appellant was in fact dangerous."

[18] Dr. Steward testified defendant was "involved," "motivated," and "responsible." Of course, the trial court discounted Steward's testimony because of his apparent ethical lapse in copying Dr. Pretkel's report. Nonetheless, we note Steward's observations are consistent with all the witnesses who have interacted with defendant since his commitment.

a person is most dangerous if "angry" with "delusions of persecution." The record does not reflect that defendant displayed anger or delusions of persecution at the time of the 2019 hearing.

We reverse and remand for the trial court to determine whether defendant has established by a preponderance of the evidence that he is either no longer mentally ill or not dangerous under supervised outpatient treatment. On remand, the court shall consider the evidence already submitted and any other relevant evidence offered by the parties. (See *McDonough*, *supra*, 196 Cal.App.4th at p. 1493; *Cross*, *supra*, 127 Cal.App.4th at p. 75.)

## DISPOSITION

The order denying outpatient status is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

_____

Miller, J.

WE CONCUR:

_____

Kline, P.J.

_____

Stewart, J.

A156715, *People v. Jaimes-Mendoza*